Bob JOHNSON, et al., Appellants,

v.

STATE of Missouri, et al., Respondents.

No. SC 92351.

Supreme Court of Missouri, En Banc.

May 25, 2012.

Paul C. Wilson, Van Matre, Harrison, Hollis, Taylor and Bacon PC, Columbia, for the Challengers.

Solicitor General James R. Layton, Attorney General's Office, Jefferson City, for the State.

Deputy Solicitor General Jeremiah J. Morgan, Attorney General's Office, Jefferson City, for the Secretary of State.

Harvey M. Tettlebaum and Robert R. Harding, Husch Blackwell LLP, Jefferson City, for the Legislators.

PATRICIA BRECKENRIDGE, Judge.

Bob Johnson and other Missouri citizens and qualified voters (Plaintiffs) appeal the trial court's judgment on their declaratory judgment action in favor of the State of Missouri and Robin Carnahan, the secretary of state (Defendants). On appeal, Plaintiffs claim that the trial court erred in finding that Plaintiffs failed to prove that the redistricting plan for the Missouri House of Representatives filed by the nonpartisan reapportionment commission does not meet the constitutional requirements for population, contiguity, and compactness. Plaintiffs further claim that the trial court erred in finding that the nonpartisan reapportionment commission did not violate the "sunshine law," chapter 610, RSMo, and in permitting three current members of the Missouri House of Representatives to intervene in the lawsuit. This Court finds that the trial court did not err in finding that Plaintiffs failed to prove that the House reapportionment map is unconstitutional and in permitting intervention by the three House members. This Court also holds that the trial court properly found that the nonpartisan reapportionment commission did not violate the sunshine law. Accordingly, the trial court's judgment is affirmed.

**Factual and Procedural History**

The Missouri Constitution provides for 163 members of the House of Representatives, whose districts are reapportioned after each decennial census of the United States. Mo. Const. art. III, sec. 2. In 2011, after the president received the 2010 census report, the governor appointed a bipartisan reapportionment commission, pursuant to Mo. Const. art. III, sec. 2, to develop a new apportionment plan for the House. The Missouri Constitution requires the bipartisan reapportionment commission to file a plan that reapportions the representatives "by dividing the population of the state by the number one hundred sixty-three" and then establishing each district "so that the population of that district shall, as nearly as possible, equal that figure." Mo. Const. art. III, sec. 2. Additionally, the constitution requires that "[e]ach district shall be composed of contiguous territory as compact as may be." *Id.* The final statement of the numbers and boundaries of the districts, together with a map of the district, required approval by at least seven members of the commission and had to be filed with the secretary of state by September 18, 2011. The commission failed to meet the deadline.

Therefore, pursuant to Mo. Const. art. III, sec. 2, this Court appointed a nonpartisan reapportionment commission, consisting of six judges of the court of appeals, to file a new apportionment plan with the secretary of state within 90 days. On November 30, 2011, the nonpartisan reapportionment commission unanimously signed and filed with the secretary of state its House of Representatives reapportionment plan.

Plaintiffs filed a declaratory judgment action to challenge the constitutionality of the plan in the Cole County circuit court on January 27, 2012. Shortly thereafter, three members of the Missouri House of Representatives[1] sought to intervene in the case under Rule 52.12(a). The trial

---

1. Intervenors Jay Barnes, Stanley Cox, and Don Gosen are citizens, residents, taxpayers, and registered voters of Missouri. Each intervenor is also a member of the Missouri House of Representatives who intends to run for re-election in 2012 in a district that would be affected by the plan. Jay Barnes is a representative for district 114 and intends to run for reelection in district 60; Stanley Cox is a representative for district 118 and intends to run for reelection in district 52; and Don Gosen is a representative for district 84 and intends to run for reelection in district 101.

court sustained their motion on February 3, 2012. The parties submitted to the trial court their joint stipulation of facts and corresponding exhibits.[2] In addition, Plaintiffs submitted the affidavit of Chris Girouard, and the intervenors submitted the affidavit of Thomas Brooks Hofeller, Ph.D.

In their stipulation of facts, the parties stipulated that the nonpartisan reapportionment commission did not act in bad faith or with improper motives in creating the plan. Specifically, the parties stipulated that:

There is no basis for finding that any district was drawn with the purpose of favoring or disfavoring any group of individuals compared to any other group of individuals including, but not limited to, any constitutionally protected or suspect class of citizens[.]

The parties also stipulated that, while the nonpartisan reapportionment commission held a public meeting on October 13, 2011, and gave 24–hour notice, it held at least three other meetings for which "[n]o public notice was posted or otherwise given for these meetings, there was no public vote to close these meetings, and no journal or minutes for these meetings was kept." Furthermore, the parties stipulated that the nonpartisan reapportionment commission "did not announce the non-public sessions at which they made their decisions."

Plaintiffs' evidence was an affidavit from Mr. Girouard with attached exhibits. Mr. Girouard is the legislative director for the Democratic caucus of the House and stated that he is "an expert in both the operation and capabilities of the [mapping software]" used by the nonpartisan reapportionment commission. In his affidavit, Mr. Girouard provides statistical analysis

of the plan submitted by the nonpartisan reapportionment commission, as well as statistical analysis of a map he prepared, and alternative map proposals from the Republican and Democratic members of the bipartisan reappointment commission that was unable to reach consensus. According to his analysis, the plan filed by the nonpartisan reapportionment commission has a "total deviation range" in population of 7.80 percent, whereas his map and the two maps proposed on August 11, 2011, by the Democratic and Republican members of the bipartisan reapportionment commission (August 11, 2011, proposals) had total deviation ranges of 0.18 percent, 3.87 percent, and 3.27 percent, respectively. He opines that the boundaries for districts 12, 15–18, 21–22, 35–38, 41, 42, 63, 64, 102, and others can be adjusted to create districts that are more equal in population. Finally, Mr. Girouard asserts that districts 43, 50, 70, 98, and 110 are not contiguous because they are split by a river that requires travel outside the district to be able to cross it by bridge.

The affidavit of Dr. Hofeller, submitted by the intervenors, details Dr. Hofeller's opinions as to the compactness and population equality of the districts in the plan. Dr. Hofeller holds a doctorate from Claremont Graduate University in American political philosophy, urban studies, and American politics. He has extensive experience with the legislative redistricting process: He has assisted in creating computerized redistricting systems, was a staff director for the United States House subcommittee on the census from 1998 to 1999, and has drafted and analyzed plans in most states throughout the country.

---

**2.** Neither the state nor the secretary of state offered evidence other than the stipulation of facts.

Regarding compactness, Dr. Hofeller explains that, although there is no precise definition of "compactness," there are various mathematical tests that assist in determining compactness. Utilizing these methods, he reviewed and scored the map and "did not find anything in that data that suggest a violation of federal or state compactness principles." He compared the compactness scores for the nonpartisan reapportionment's plan against the map proposed on August 11, 2011, by the Democratic members of the bipartisan reapportionment commission, the map proposed by the Republican members of the bipartisan reapportionment commission, and Plaintiffs' proposed map and found that the scores for the plan compared favorably against the other maps. He performed a similar comparison against legislative redistricting maps from Maryland and Virginia. Regarding population equality, Dr. Hofeller stated that the total deviation range of 7.81 percent is well within the 10.00 percent range that is prima facie valid under the federal population equality standard for legislative redistricting plans.

After receiving the stipulation of facts and the witnesses' affidavits submitted by Plaintiffs and the intervenors, the trial court executed its findings of fact, conclusions of law, and judgment on February 14, 2012, denying each of Plaintiffs' claims. Plaintiffs appeal.[3] On appeal, Plaintiffs claim that the trial court erred in finding that they failed to prove that the plan is unconstitutional under Mo. Const. art. III, sec. 2. They also claim that the plan is unconstitutional under Mo. Const. art. I, secs. 2 and 25 because the districts do not meet the requirements of contiguous territory, compactness, and population equality. Plaintiffs further claim that the trial court erred in finding that there was no sunshine law violation when the nonpartisan reapportionment commission held three closed meetings without public notice 24 hours in advance, held no vote to close the meetings, and took no journal entries or minutes from the meetings. Finally, they claim that the trial court abused its discretion in granting the intervenors' motion to intervene. The intervention and sunshine law claims are addressed first because, if either claim is meritorious, the remaining constitutional claims need not be addressed. *See State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n*, 687 S.W.2d 162, 165 (Mo. banc 1985) (constitutional questions should be avoided if the case can be fully determined on other grounds).

## Standard of Review

In reviewing the validity of the reapportionment map, claims are "subject to proof and defenses as in any other lawsuit." *See Pearson v. Koster*, 359 S.W.3d 35, 40 (Mo. banc 2012) (*Pearson I*). This Court recently clarified the standard of review for court-tried civil cases in *White v. Director of Revenue*, 321 S.W.3d 298, 307–08 (Mo. banc 2010). In *White*, the Court outlined the role of an appellate court as follows:

In appeals from a court-tried civil case, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. To set aside a judgment as "against the weight of the evidence," this Court must have a firm belief that the judgment is wrong.

In reviewing a particular issue that is contested, the nature of the appellate court's review is directed by whether the matter contested is a question of fact or law. When the facts relevant to an issue are contested, the reviewing court defers to the trial court's assessment of the evidence.

---

3. On its own motion, this Court took transfer of this case prior to its disposition by the court of appeals. Mo. Const. art. V, sec. 10; Rule 83.01.

It is only when the evidence is uncontested that no deference is given to the trial court's findings. Evidence is uncontested in a court-tried case when the issue before the trial court involves only stipulated facts and does not involve resolution by the trial court of contested testimony; in that circumstance, the only question before the appellate court is whether the trial court drew the proper legal conclusions from the facts stipulated. Evidence also is uncontested when a party "has admitted in its pleadings, by counsel, or through the [party's] individual testimony the basic facts of [other party's] case." In such cases, the issue is legal, and there is no finding of fact to which to defer.

&ast; &ast; &ast;

When evidence is contested by disputing a fact in any manner, this Court defers to the trial court's determination of credibility. A trial court is free to disbelieve any, all, or none of that evidence. Appellate courts defer to the trial court on factual issues "because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." The appellate court's role is not to re-evaluate testimony through its own perspective. Rather, the appellate court confines itself to determining whether substantial evidence exists to support the trial court's judgment; whether the judgment is against the weight of the evidence—"weight" denoting probative value and not the quantity of the evidence; or whether the trial court erroneously declared or misapplied the law.

*Id.* (citations omitted).

■ The application of this standard of review is impacted by which party carries the burden of proof in the case. In civil actions, the party bearing the burden of proof is the one "who, as is disclosed from the pleadings, asserts the affirmative of an issue." *Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A.*, 803 S.W.2d 23, 30 (Mo. banc 1991). "When the burden of proof is placed on a party for a claim that is denied, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence." *White*, 321 S.W.3d at 305. If no evidence is presented or "[i]f the trier of fact does not believe the evidence of the party bearing the burden, it properly can find for the other party." *Id.*

■ In a case challenging a reapportionment plan, this Court reviews the plan under identical standards for review of a statute, even though a plan filed by a reapportionment commission is not a statute enacted by the legislature. In *State ex rel. Barrett v. Hitchcock*, this Court reviewed the constitutional validity of a reapportionment plan created by a commission comprised of the governor, secretary of state, and attorney general, as provided by the constitution at that time. 241 Mo. 433, 146 S.W. 40, 41 (1912). This Court stated that:

> [T]he Constitution created the [reapportionment commission] for the express purpose to apportion the state into senatorial districts, and for that purpose the Constitution gives to it the same power and authority that it gave to the Legislature proper in that regard; and for that reason both of them must, and do, stand upon an equal footing before the law and in the presence of the courts.

*Id.* at 56.

■ Because the constitution grants the commission the power to perform a

legislative function—i.e., to reapportion congressional districts, Mo. Const. art. III, sec. 45—the reasoning in *State ex rel. Barrett* equally applies to this case. Accordingly, this Court reviews the constitutional validity of the plan as if it were a statute enacted by the legislature. It is assumed to be constitutional and will not be held unconstitutional unless the plaintiff proves that it "clearly and undoubtedly contravene[s] the constitution." *Mo. Prosecuting Attorneys v. Barton Cnty.*, 311 S.W.3d 737, 740–41 (Mo. banc 2010); *St. Louis Cnty. v. Prestige Travel, Inc.*, 344 S.W.3d 708, 712 (Mo. banc 2011). This Court will uphold the plan unless it "plainly and palpably affronts fundamental law embodied in the constitution," and "doubts will be resolved in favor of the constitutionality" of the plan. *Barton Cnty.*, 311 S.W.3d at 741 (internal quotations and citations omitted).

## Motion to Intervene

 Plaintiffs claim that the trial court erred in granting the intervenors' motion to intervene in this case. They contend that the intervenors failed to assert a legally protectable interest in the case that is not protected adequately by Defendants. Intervention is permitted by Rule 52.12(a) as a matter of right or by Rule 52.12(b), which provides for intervention by permission of the court. Rule 52.12.[4] A trial court's decision regarding intervention as a matter of right will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *See In re Liquidation of Prof'l Med. Ins. Co.*, 92 S.W.3d 775, 778 (Mo. banc 2003). This Court reviews permissive intervention for abuse of discretion. *Comm. for Educ. Equal. v. State*, 294 S.W.3d 477, 487 (Mo. banc 2009). Intervention generally should "be allowed with considerable liberality." *In re Liquidation of Prof'l Med. Ins. Co.*, 92 S.W.3d at 778; *Eakins v. Burton*, 423 S.W.2d 787, 790 (Mo.1968) (noting that the intervention rule should be construed liberally to permit broad intervention).

The trial court's summary ruling on the intervenors' motion to intervene was reflected in a docket entry stating: "Court sustains Motion To Intervene." The trial court's judgment included findings of fact regarding intervention:

> Defendant–Intervenors are citizens, residents, registered voters, and taxpayers of the State of Missouri. [They] are state representatives, who intend to run

4. Rule 52.12 provides in relevant part:
 (a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this state confers an unconditional right to intervene or (2) when the applicant claims an interest relating to the property or transaction that is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 (b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common; or (3) when the validity of a statute, regulation or constitutional provision of this state, or an ordinance or regulation of a governmental subdivision thereof, affecting the public interest, is drawn in question in any action to which the state or governmental subdivision or an officer, agency or employee thereof is not a party, the court may in its discretion notify the chief legal officer of the state or governmental subdivision thereof, and the state or governmental subdivision may in the discretion of the court be permitted to intervene, upon proper application.

for re-election.... The particular harms threatened to Defendant–Intervenors' interests include their specific and personal interests in running for re-election in districts established in compliance with Missouri's constitution and the delay, uncertainty, and expenditures of time and resources that they will suffer if the New House Map is invalidated. Nothing in the trial court's order or findings of fact expressly states whether the trial court intended to allow the intervenors to intervene as a matter of right under Rule 52.12(a) or as a matter of permissive intervention under Rule 52.12(b). The trial court's findings regard issues more relevant to permissive intervention under Rule 52.12(b), so this Court focuses on whether the intervenors were entitled to such intervention.

■ At issue in this case is whether permissive intervention was appropriate insofar as Rule 52.12(b) permits intervention when a proposed intervenor's claim or defense and the main action have a question of law or fact in common. *See Comm. for Educ. Equal. v. State*, 294 S.W.3d at 487. Rule 52.12(b) provides for permissive intervention in three circumstances: "(1) when allowed by statute; (2) when an applicant's *claim or defense* and the main action have a question of law or fact in common; or (3) when the state is seeking intervention in a case raising constitutional or statutory challenges." *Comm. for Educ. Equal. v. State*, 294 S.W.3d at 487. Proposed intervenors are not entitled to permissive intervention if they simply will reassert the same defenses, but intervention can be appropriate when the intervenors can show "interest *unique* to themselves." *See id.* (emphasis added). Moreover, "[p]ermissive intervention may be permitted when the intervenor has an economic interest in the outcome of the suit." *Meyer v. Meyer*, 842

S.W.2d 184, 188 (Mo.App.1992) (internal quotations omitted); *see also Matter of Additional Magistrates for St. Louis Cnty.*, 580 S.W.2d 288, 295 n. 6 (Mo. banc 1979) (noting that a party properly could have been permitted to intervene where its economic interests were at issue).

■ This Court must confine its review of permissive intervention under Rule 52.12(b) to considering whether the trial court's ruling was an abuse of discretion because it was "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 131 (Mo. banc 2000).

Plaintiffs contend that the trial court abused its discretion in granting the intervenors permissive intervention under Rule 52.12(b) because the intervenors failed to show that their status as taxpayers was sufficient to justify their being allowed to duplicate Defendants' defense of the case. The intervenors, however, convinced the trial court that they had unique interests at stake in this case that went beyond their interests as taxpayers. The trial court's findings highlighted the intervenors' personal and economic interests related to their planned reelection efforts, including interests in preventing delay and uncertainty and in avoiding unnecessary expenditures of time and resources.

Based on the facts of this case, this Court is not persuaded that the trial court abused its discretion in permitting intervention under Rule 52.12(b).

### Sunshine Law

■ Plaintiffs claim that the trial court erred in finding that the nonpartisan reapportionment commission did not violate the provisions of Missouri's open meetings and records law in chapter 610, RSMo, known

generally as the "sunshine law." They contend that the nonpartisan reapportionment commission is a "public governmental body" that must act in accordance with the sunshine law and that it failed to do so when it held three closed meetings without providing public notice, failed to hold a public vote to close the meetings, and failed to take minutes or journal entries to document the meetings. Plaintiffs assert that, as a consequence of the nonpartisan reapportionment commission's failure to comply with the sunshine law, the plan is invalid and cannot be used by the secretary of state.

Assuming, solely for the purposes of this opinion, that the statutory provisions of the sunshine law were to govern judicial institutions, the express language of the sunshine law makes its provisions inapplicable to the meetings held by the nonpartisan reapportionment commission. Section 610.010 [5] defines a "public governmental body" as "any legislative, administrative or governmental entity created by the constitution or statutes of this state, by order or ordinance of any political subdivision or district, *judicial entities when operating in an administrative capacity,* or by executive order[.]" (emphasis added). Under Mo. Const. art. III, sec. 2 and art. V, sec. 4, the nonpartisan reapportionment commission consists entirely of judges from the court of appeals. Because it is comprised solely of members of the judicial branch, the nonpartisan reapportionment commission is a "judicial entity," and the provisions of the sunshine law only apply if it is "operating in an administrative capacity." Section 610.010.

The nonpartisan reapportionment commission did not operate in an administrative capacity, however, when it held the three closed meetings at issue. The nonpartisan reapportionment commission was responsible for reapportioning the House districts according to Mo. Const. art. III, sec. 2, which is a legislative function despite being performed by a judicial entity. *See State ex rel. Teichman v. Carnahan,* 357 S.W.3d 601, 605 (Mo. banc 2012). Meetings held by the nonpartisan reapportionment commission were in furtherance of that responsibility and resulted in a plan that had the force and effect of a statute. *See Barrett,* 146 S.W. at 56. The meeting was not held in an administrative capacity for the administration of the courts. *See* Sup.Ct. Operating Rule 2.03(a) (administrative records are open to the public, defined as "all records, including reports and correspondence, pertaining to the administration of the courts."). As a consequence, actions by the nonpartisan reapportionment commission explicitly were exempted from the provisions of the sunshine law. The trial court did not err in refusing to invalidate the plan based on the sunshine law.

### Validity of the Plan under the Missouri Constitution

Plaintiffs' primary substantive challenges to the plan filed by the nonpartisan reapportionment commission are that it violates art. III, sec. 2 of the Missouri Constitution because the districts are not sufficiently equal in population, compact, or contiguous. Plaintiffs specifically claim that the trial court erred in: (1) applying an incorrect standard when it found that Plaintiffs failed to prove the plan was not as nearly equal in population as possible, in that the trial court considered the federal requirement of a total deviation range of 10.00 percent in legislative redistricting plans, district compactness, political subdivision lines, and the federal voting rights act when determining the possible popula-

---

**5.** Unless indicated otherwise, all statutory references are to RSMo Supp.2010.

tion equality in each district; (2) applying an incorrect standard to find that Plaintiffs failed to prove that the districts are not contiguous under Mo. Const. art. III, sec. 2 when various districts are divided by a major river without a connecting bridge; (3) incorrectly applying a standard based on a lack of motive to gerrymander and a lack of compactness in other maps to find that Plaintiffs failed to prove that the districts are not as compact as may be because compactness should be sacrificed only to achieve population equality; and (4) declaring that the plan does not violate Mo. Const. art. I, secs. 2 and 25 when the impact of Plaintiffs' vote is affected by the lack of contiguousness, compactness, and population equality among the districts.

 Constitutional challenges to the plan filed by the nonpartisan reapportionment commission present a justiciable claim for which this Court has jurisdiction. " 'It is well settled that courts have jurisdiction and authority to pass upon the validity of legislative acts apportioning the state into senatorial or other election districts and declare them invalid for failure to observe nondiscretionary limitations imposed by the Constitution.' " *Teichman,* 357 S.W.3d at 606 (quoting *Preisler v. Hearnes,* 362 S.W.2d 552, 555 (Mo. banc 1962)). This Court, therefore, properly considers the merits of Plaintiffs' constitutional challenge to the plan.

The enactment of Mo. Const. art. III, sec. 2 was a direct result of a successful equal protection challenge to the previous constitutional provisions relating to legislative reapportionment. Prior to 1966, the constitution apportioned the Missouri House of Representatives by requiring that each county in the state have at least one representative. *See* Mo. Const. art. IV, sec. 2 (1959).

In 1964, the United States Supreme Court, in *Reynolds v. Sims,* held that "the

Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis." 377 U.S. 533, 576, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Later that year, in *Jonas v. Hearnes,* four Missouri citizens and voters brought an action in federal court claiming that the reapportionment standards for House of Representative districts in Mo. Const. art. III, secs. 2 and 3 (1959) and Senate districts in Mo. Const. art. III, secs. 5 and 7 were unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. 236 F.Supp. 699, 701 (W.D.Mo.1964). The United States District Court for the Western District held that the reapportionment of the House and Senate districts was not in accordance with "constitutionally permissible standards as laid down in *Reynolds v. Sims, supra,* and with the guarantees of equal protection of law insured by the Fourteenth Amendment." *Id.* at 704, 708. Instead of invalidating the provisions as unconstitutional, the court reserved jurisdiction and permitted the General Assembly to "promptly devise and pass legislation creating and establishing a system of legislative districting and apportionment of the House of Representatives and the Senate thereof, in accordance with federal constitutional standards...." *Id.* at 709.

In response to the *Jonas* decision, the General Assembly submitted to the people proposed amendments to the provisions relating to reapportionment of the House and Senate districts. In January 1966, the people amended the constitution by adopting the provisions in Mo. Const. art. III, secs. 2, 5, and 7. The provisions adopted in 1966 for the reapportionment of districts for the House of Representatives in art. III, sec. 2 require that the districts be, equal in population as nearly as possible, contiguous, and as compact as may be. In pertinent part, the provision states:

The commission shall reapportion the representatives by dividing the population of the state by the number one hundred sixty-three and shall establish each district so that the population of that district shall, as nearly as possible, equal that figure.

Each district shall be composed of contiguous territory as compact as may be.

Mo. Const. art. III, sec. 2. The standards adopted in 1966 for the reapportionment of Senate districts are enumerated in art. III, secs. 5 and 7.[6]

 These requirements in the constitution for drawing a reapportionment map are mandatory and objective, although the language used in the requirements themselves creates a level of flexibility in their compliance. *See Pearson I*, 359 S.W.3d at 40. Specifically, the plan reapportioning House districts must: (1) have population equality "as nearly as possible"; (2) have contiguous territory; and (3) be as compact "as may be." Mo. Const. art. III, sec. 2. Although adopted in response to equal protection concerns, these three requirements also work together to guard against the evil of gerrymandering. *See Pearson I*, 359 S.W.3d at 38 (quoting *Barrett*, 146 S.W. at 61).

 Under these requirements, the starting point for drawing a valid map is the requirement that the district must be contiguous because the standard for this requirement is absolute. The language that each district "shall be composed of contiguous territory" is free of any phrase that could broaden the meaning of "contiguous." In contrast, the standards for the requirements of population equality and compactness are not absolute. For population equality, the reapportionment commission must divide the state population by 163 and make each district, "as nearly as possible, equal that figure." Under this standard, the ability to attain population equality is dependent upon that which is "possible." Similarly, the requirement that the map be "as compact as may be" allows some flexibility, although, as noted above, satisfaction of the requirement itself is mandatory. The compactness standard, unlike the one for contiguity, requires consideration of other factors, necessarily including the boundary lines of neighboring districts from the one in question.[7]

 The standards for compactness and population equality also are inherently interrelated. It is impossible to consider whether the map is as compact "as may be" without also considering whether the population is "as nearly as possible, equal." One determination cannot be made without consideration of the other. This Court summarized the interrelationship between the standards in *Pearson I*:

> [T]he provision requiring compactness of territory, subject, as it may be, to other

---

6. Art. III, sec. 5 establishes 34 senatorial districts and provides that "the state shall be divided into convenient districts of contiguous territory, as compact and nearly equal in population as may be." Art. III, sec. 7 also addresses the population standard for senatorial districts. It reads:

> The commission shall reapportion the senatorial districts by dividing the population of the state by the number thirty-four and shall establish each district so that the population of that district shall, as nearly as possible, equal that figure; no county lines

> shall be crossed except [as necessary to add population and must then] be as nearly equal as practicable in population.

Mo. Const. art. III, sec. 7.

7. Although the standard for compactness is contextual, the determination of the constitutional validity of the map under Mo. Const. art. III, sec. 2 remains focused on whether *each* constitutional requirement is met for *each* district. *See Pearson I*, 359 S.W.3d at 39.

more definitely expressed rules, may also, in application, be modified by the requirement of equality in population … that 'compactness, being of less importance, may, to some extent, yield in aid of securing a nearer approach to equality of representation.

*Id.* (quoting *State ex rel. Barrett,* 146 S.W. at 61 (internal citations omitted)). By virtue of this interrelatedness, it is more important to attain population equality in each district than compactness. *Id.*

▬ Because multiple district configurations can meet the constitutional requirements, there is no perfect map. *See id.* at 39. If that were required by the constitutional standards, there would be no finality in the redistricting process. Additionally, the variation permitted under the "as nearly as possible, equal" and "as compact as may be" standards shows that the constitution does not require absolute perfection in a map because "compactness and numerical equality cannot be achieved with absolute precision." *See id.* The primary disagreement by the parties in this case, however, is the amount of variation permitted by the "as nearly as possible" and the "compact as may be" language in the standards.

Particularly, the parties disagree as to the meaning of the word "possible" within the standard for population equality. Although Plaintiffs concede that the term "possible" does not require perfect precision in population equality, they contend that a strict definition should apply, such that the map should attain the highest degree of population equality possible. Plaintiffs assert that this Court should require population deviations similar to the near-zero-tolerance rule for congressional districts provided in *Kirkpatrick v. Preisler*, in which the United States Supreme Court held that a deviation of less than 3 percent from the ideal population figure

was invalid. 394 U.S. 526, 528–30, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). Defendants and the intervenors assert the contrary, stating that the meaning of "possible" should broadly allow for flexibility in the level of population equality based on permissible factors. They contend that this Court should follow federal decisions finding that population deviations of 10.00 percent or less are prima facie evidence of constitutional validity for the reapportionment of state legislative districts. *See generally Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *White v. Regester,* 412 U.S. 755, 764, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

▬ In ascertaining the meaning of the word "possible" in the standard for population equality, the primary rule is to "give effect to the intent of the voters who adopted the Amendment" by considering the plain and ordinary meaning of the word. *Keller v. Marion Cnty. Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991); *StopAquila.org v. City of Peculiar,* 208 S.W.3d 895, 902 (Mo. banc 2006). The plain and ordinary meaning of a word used in a constitutional provision is the meaning that "the people commonly understood the word[ ] to have when the provision was adopted." *Buechner v. Bond,* 650 S.W.2d 611, 613 (Mo. banc 1983). If the voters' intent cannot be ascertained from the plain and ordinary meaning of the language due to "duplicity, indistinctness or uncertainty of meaning of an expression," it is ambiguous. *See J.B. Vending Co. v. Dir. of Revenue,* 54 S.W.3d 183, 188 (Mo. banc 2001) (stating the definition of "ambiguous"). The commonly understood meaning of a word can be found in the dictionary. *StopAquila.org,* 208 S.W.3d at 902. If a word has more than one dictionary definition that applies in the context of the provision,

it is ambiguous. *See Auto Owners (Mut.) Ins. Co. v. Sugar Creek Mem'l Post No. 3976,* 123 S.W.3d 183, 188 (Mo.App.2003).

 Considering the dictionary definition of the disputed term in this case, the word "possible" has a variety of potential meanings. The relevant definitions of "possible" in the dictionary are:

1 [a]: falling or lying within the powers (as of performance, attainment, or conception) of an agent or activity express or implied: being within or up to the limits of one's ability or capacity as determined by nature, authority, circumstances, or other controlling factors [b]: falling within the bounds of what may be done, occur, be conceived, or be attained within the framework of nature, custom, or manners [c]: being such to the utmost degree[.] 2: Able[.] 3 [a]: that may or may not occur: that may chance: dependent on contingency: neither probable nor impossible [b]: likely, probable—usually used with an adverb expressing doubt 4: having an indicated potential by nature or circumstances: able or fitted to become, be used, or otherwise serve 5: capable of being surmounted, traversed, or dealt with: neither unacceptable nor intolerable—often used with an adverb expressing doubt[.]

Syn practicable, feasible: Possible is used to dispel doubt that something may or does occur or exist or may come to exist[.] Practicable refers to what may be readily effected, executed, practiced, used, or put into operation[.] Feasible may designate what is likely to work out or be put into effect successfully or what in a difficult situation seems the expedient least liable to fail[.]

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1771 (1993) (internal notations omitted). In light of these dictionary definitions, and in the context of art. III, sec. 2, there are several definitions that could apply, so the plain and ordinary meaning of the word "possible" is uncertain and the term is ambiguous. In the context of the population standard, the meaning of "possible" could range from the narrow definition of "being such to the utmost degree" to the broader definition of "falling within the bounds of what may be done, occur, be conceived, or be attained within the framework of nature, custom, or manners." *Id.* To resolve such ambiguity, the rules applicable to the construction of statutes are also applicable to the construction of constitutional provisions. *Buechner,* 650 S.W.2d at 613.

 In considering which of the potential dictionary definitions should apply, the term "possible," in the context of the population standard, cannot mean population equality "to the utmost degree" as urged by Plaintiffs. Such a construction is precluded on constitutional grounds. If a constitutional provision can be interpreted in different ways, one constitutional and the other unconstitutional, the constitutional construction shall be adopted. *See Blaske v. Smith & Entzeroth, Inc.,* 821 S.W.2d 822, 838–39 (Mo. banc 1991). Although art. III, sec. 2 is a provision in the Missouri Constitution, it nonetheless must comply with the United States Constitution because of the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2.[8]

 Under the Supremacy Clause, state laws and constitutional provisions are "preempted and have no effect" to the extent they conflict with federal laws. *See*

---

8. The Supremacy Clause of the United States Constitution states that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

*State ex rel. Proctor v. Messina,* 320 S.W.3d 145, 148 (Mo. banc 2010). By operation of the Supremacy Clause, the nonpartisan reapportionment commission must comply with the Equal Protection Clause of the United States Constitution and the Voting Rights Act in determining what population equality is "possible." The Equal Protection Clause of the Fourteenth Amendment protects against racial gerrymandering in reapportioning districts. *See Shaw v. Reno,* 509 U.S. 630, 641, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Similarly, subsection 2(a) of the Voting Rights Act of 1965 prohibits states from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. section 1973(a). A valid map must comply with the Voting Rights Act. *See* U.S. Const. art. VI, cl. 2. Interpreting "possible" to mean strictly "to the utmost degree" in population equality would exclude consideration of these additional factors, including the factors mandated by the Supremacy Clause. Therefore, "possible" must be construed broadly enough to permit consideration of additional factors by a reapportionment commission. *See Blaske,* 821 S.W.2d at 838–39.

Although constitutional considerations preclude a narrow construction, the context of the word "possible" in the phrase "as nearly as possible" also precludes an overly broad meaning. The phrase "as nearly as," modifying "possible," is not given effect under the broadest dictionary definition, which would require population equality only "within the bounds of what may be done, occur, be conceived, or be attained within the framework of nature, custom, or manners." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1771 (1993). Instead, a dictionary definition

falling between the two extremes is more reflective of the standard necessary to meet constitutional requirements and intended by the phrase "as nearly as possible." The definition of "being within or up to the limits of one's ability or capacity as determined by nature, authority, circumstances, or other controlling factors," *id.,* permits compliance with the mandatory requirements of federal law and is consistent with use of "possible" as a synonym for "practicable" in the dictionary definition set out above.

In this regard, in determining the meaning of "possible" for the reapportionment of House districts, this Court also considers the identical language used for the reapportionment of Senate districts. Mo. Const. art. III, sec. 7 says the commission "shall establish each district so that the population of that district shall, *as nearly as possible, equal* that figure" yet also says that, where county lines must be crossed in the case of a multi-district county, the resulting cross-county district must be "*as nearly equal as practicable* in population." (emphasis added). Mo. Const. art. III, sec. 5, similarly to its House counterpart, says that "the state shall be divided into convenient districts of contiguous territory, as compact and nearly equal in population as may be." The use of all three terms "practicable," "possible" and "as may be" in sections 5 and 7 of article III in referring to the population requirement for Senate districts, along with the fact that "practicable" is a synonym of "possible," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1771 (1993), both reinforce the conclusion that the term "possible" is not used in the strict sense of equal to the absolute degree.

This intermediate definition of "possible" is consistent with this Court's precedent recognizing that other factors are inherently included within the constitution-

al standards governing the reapportionment process, although not expressly articulated as a separate requirement in the constitution. These factors were identified by this Court in *Preisler v. Doherty,* 365 Mo. 460, 284 S.W.2d 427 (1955), *Hearnes,* 362 S.W.2d 552, and *Preisler v. Kirkpatrick,* 528 S.W.2d 422, 426 (Mo.1975). In *Doherty,* this Court distinguished the process of city officers dividing St. Louis into districts from the process of redistricting the state because "it is obvious that it is much easier for them to make compact districts than for a legislature or commission restricted to county lines (or following town, ward or other district lines)...." 284 S.W.2d at 432. In *Hearnes,* a case challenging congressional districts, this Court stated that

> [C]ounties are important governmental units, in which the people are accustomed to working together. Therefore, it has always been the policy of this state, in creating districts of more than one county (congressional, judicial or senatorial) to have them composed of entire counties.... We must hold that it was proper for the legislature to follow this policy. In fact, to do otherwise would lead to the most vicious kind of gerrymander. The only departure therefrom in the 1961 Act was in our two largest cities, St. Louis and Kansas City.... Urban conditions may justify this treatment.

362 S.W.2d at 556–57. The Court also stated that "it is not improper to consider the precedents of allocation of counties to existing districts in deciding the composition of new enlarged districts." *Id.* at 557.

Later, this Court in *Preisler v. Kirkpatrick* cited the United States Supreme Court in *Reynolds,* 377 U.S. 533, 84 S.Ct. 1362, to recognize that "districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 528 S.W.2d at 425 (internal quotations omitted). This Court also recognized that population density may affect boundary lines, stating that "population density of the state is, of course, uneven and any effort to accomplish both the overriding objective of [population equality] and the preservation of county lines reasonably may be expected to result in the establishment of districts that are not aesthetically pleasing models of geometric compactness." *Id.* at 426.

As provided in these cases, the language used in the constitutional requirements implicitly permits consideration in the redistricting process of population density; natural boundary lines; the boundaries of political subdivisions, including counties [9] municipalities, and precincts; and the historical boundary lines of prior redistricting maps.[10] This Court recently affirmed the continued propriety of recognized, unenumerated factors in *Pearson I. See* 359

9. Although this Court's prior opinions, including *Pearson I,* recognize that county lines validly may be considered in reapportioning congressional and house districts, the Missouri Constitution makes it a mandatory factor in the reapportionment of senate districts. *See* Mo. Const. art. III, secs. 5 and 7.

10. The concurring opinion criticizes this Court's redistricting precedent because it fails to provide a "definitive list of factors" that are permissible. A definitive list of factors is found in this Court's precedent, which this opinion describes and lists. The concurring opinion also asserts that this opinion is adopting all of the factors recognized by the United States Supreme Court despite express language that some factors listed are not recognized by this Court. Nothing in this opinion should be construed as expanding the list of factors beyond those recognized in this Court's precedent. As a whole, these recognized factors provide guidance in the redistricting process and protect Missourians from the risk of arbitrary decisions.

S.W.3d at 40 (recognizing the importance of preservation of "the integrity of the existing lines of our various political subdivisions." despite not expressly stated as a separate consideration in the constitution).[11]

Interpreting the language "as may be" and "as possible" as allowing for consideration of other recognized factors is consistent with the United States Supreme Court's requirement for congressional districts to have population equality "as nearly as is practicable" under its interpretation of the Equal Protection Clause in the United States Constitution. *See Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The federal standard permits "minor variations which 'are based on legitimate considerations incident to the effectuation of a rational state policy.'" *Swann v. Adams*, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967).[12] As with this Court, the United States Supreme Court recognizes that legitimate considerations include recognition of natural boundary lines, recognition of historical district boundary lines, and respect for boundaries of political subdivisions.[13] *See id.*; *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).[14]

11. The concurrence asserts that this Court's opinion "overrules three holdings central to *Pearson I*." This assertion seeks to expand the holding of *Pearson I*. *Pearson I* held that the trial court erred in granting a motion to dismiss because there was a "question of fact, yet to be tried, whether those districts are "as compact and nearly equal in population *as may be*." 359 S.W.3d at 40. In doing so, it recognized that the constitutional requirements are mandatory and objective for each district, overruling *Kirkpatrick*, *Doherty*, and *Hearnes* to the extent that they used the subjective "wholly disregard" and "good faith effort" standards and failed to require that each district comply with the constitutional standards. *See Pearson I*, 359 S.W.3d at 39 (referring to the "*Preisler* cases."). Beyond the application of the good faith and wholly disregard standards and consideration of the validity of a map as a whole, *Kirkpatrick*, *Doherty*, and *Hearnes* remain good law, and both *Pearson I* and *State ex rel. Teichman* cite them as such. *See id.* at 39; *State ex rel. Teichman v. Carnahan*, 357 S.W.3d 601, 606 (Mo. banc 2012). This opinion is consistent with *Pearson I* in every respect.

12. The concurrence misconstrues the application of the principle that permits "minor variations which 'are based on legitimate considerations'" when it cites it as support for the proposition that recognized reapportionment factors cannot be used to justify deviations as part of the constitutional standards. The Supreme Court explicitly stated in *Reynolds v. Sims* that "[s]o long as divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some *deviations from the equal-population principle are constitutionally permissible* [.]" 377 U.S. 533, 579, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, contrary to proposition stated by the concurrence, the United States Supreme Court in fact allows for "deviations from the equal-population principle" based on recognized factors. *See id.* This interpretation of "as nearly as is practicable" is analogous to this Court's interpretation of "as possible" and "as may be."

13. In *Kirkpatrick v. Preisler*, the Supreme Court recognized an exception to the consideration of county or municipal boundaries in a challenge to the population equality of congressional districts under the United States Constitution, stating that it is improper to justify deviations based on political subdivision boundaries. 394 U.S. 526, 533–34, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). Since *Kirkpatrick v. Preisler*, however, the Supreme Court expressly identifies respect for municipal and county boundaries as legitimate considerations in congressional redistricting. *See Abrams v. Johnson*, 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (citing *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983)); *see also Bush v. Vera*, 517 U.S. 952, 963, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

14. The Supreme Court has also stated that certain factors cannot be considered when seeking to attain population equality under

The Supreme Court also identifies other factors that may justify variances, which this Court does not recognize, such as maintaining communities of interest and avoiding contests between incumbents. *See Karcher*, 462 U.S. at 740, 103 S.Ct. 2653. Similar to the United States Supreme Court's interpretation of the "as nearly as is practicable" standard under the Equal Protection Clause, this Court interprets the requirements in the Missouri Constitution to implicitly permit the legislature to comply with federal laws and consider recognized factors yet still comply with the requirements of the Missouri Constitution. The requirements for population equality "as nearly as possible" and compactness "as may be" allows for consideration of these recognized factors. *See Pearson I*, 359 S.W.3d at 39.

The concurring opinion both misinterprets the law and seeks to overrule portions of this Court's precedent which, for the last century, has defined the language used in the Missouri Constitution to include consideration of these factors, despite not being expressly stated. *See id.* (counties as important governmental units); *Kirkpatrick*, 528 S.W.2d at 426 (political subdivisions, historical boundary lines, and population density); *Hearnes*, 362 S.W.2d at 556–57 (counties as important governmental units); and *Doherty*, 284 S.W.2d at 432 (county, town, ward or other district lines). These cases do not hold that constitutional requirements can be disregarded to consider other factors but, instead, recognize that the constitutional requirements themselves incorporate such considerations by use of the

standards "as may be," and "as possible." As part of the standards for the constitutional requirements, federal law and the previously recognized factors are *in fact* of constitutional significance, and this Court recognizes that in its precedent.

■■■■ Plaintiffs' burden of proving that the current plan is unconstitutional, therefore, must account for the additional factors that the reapportionment commission must consider and those that it is permitted to consider. For the contiguousness requirement, it is an absolute standard that either is satisfied or not satisfied by the challenged map. The population equality and compactness requirements, on the other hand, have interrelated standards that are impacted by the existence of other possibilities. For these requirements, proof that the standards for population equality and compactness are not met requires the party challenging the map to present evidence that greater population equality and compactness are feasible in that the plan deviates from those principles. But showing the ability to attain greater mathematical precision is not enough. The plaintiff also must prove that any minimal and practical deviation from population equality or compactness in a district does not result from application of recognized factors that may have been important considerations in the challenged map.

■■■■ In this regard, the issue of whether the constitutional requirements are satisfied is determined objectively, requiring no proof of the subjective intent of the reapportionment commission. *See*

the United States Constitution. In *Reynolds v. Sims*, the Supreme Court detailed that "history alone [referring to history as the historical number of districts as a basis for representation, not the location of historical boundary lines as later identified in *Swann*], nor economic or other sorts of group interests, are

permissible factors in attempting to justify variances from population-based representation.... Considerations of area alone provide an insufficient justification for deviations from the equal-population principle." 377 U.S. 533, 580, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

*Pearson I*, 359 S.W.3d at 40. To meet the objective standard, a plaintiff must present evidence that greater population equality and compactness is feasible in one or more districts. But that is not all. The plaintiff must also show that federal laws or other recognized factors did not affect the district boundary. This showing is not burdensome on the plaintiff: the plaintiff needs only to submit maps or other evidence that objectively shows that county lines, political subdivisions, or historical boundary lines were not a basis for the district boundary or that it goes beyond a "minimal and practical deviation[.]" *See id.* at 40. So long as the evidence persuades the trial court that the challenged map "clearly and undoubtedly contravenes the constitution," the plaintiff will prevail. *See Barton Cnty.*, 311 S.W.3d at 740–41.

In this case, Plaintiffs must satisfy this burden to prove that the plan is unconstitutional. Because the plan is unconstitutional if it fails to meet any of the requirements enumerated in art. III, sec. 2, this Court first addresses Plaintiffs' showing for the absolute requirement of contiguity, followed by the interrelated requirements of population equality and compactness.

Plaintiffs claim that six districts in the map of the nonpartisan reapportionment commission are not contiguous because rivers make a portion of each district inaccessible so that it can only be reached by traveling through one or more other districts. Under art. III, sec. 2, the House districts "shall be composed of contiguous territory[.]" The plain and ordinary meaning of "contiguous" is provided by the dictionary definition of "touching or connected throughout." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 492 (1993).

In addition, the dictionary definition of "territory" references a geographic area without regard to whether the portions of the land within the geographic area are split by large rivers or other bodies of water. *Id.* at 2361. The constitutional requirement of contiguous territory does not depend on the particular geographical characteristics of the territory circumscribed within a district. As a result, a district is composed of contiguous territory when the territory within the district is touching or connecting throughout the entire district. *See id.* at 492.

This Court ruled consistently when construing the term "contiguous" in the context of a municipal annexation. In *State ex rel. Kansas City v. North Kansas City*, this Court held that the contiguity of a proposed annexation area was not broken by the Missouri River where the city limit was the center of a river that constituted the boundary line of two counties. 360 Mo. 374, 228 S.W.2d 762, 773 (1950), *abrogated on other grounds by State ex inf. Hannah v. City of St. Charles*, 676 S.W.2d 508, 512 (Mo. banc 1984) (finding that the enactment of a charter statute makes prior caselaw discussing charter amendments obsolete).[15]

Similarly, the Supreme Court of Florida rejected an argument nearly identical to Plaintiffs' under a similar requirement that legislative districts be contiguous in *In re Constitutionality of House Joint Resolution 1987*, 817 So.2d 819 (Fla.2002). *See* Fla. Const. art. III, section 16. There, a district boundary crossed a large lake to include a population center in one county with a population center in another county, without including any connecting territory on the lakeshore. *Id.* at 828. The court

15. In its decision, this Court noted that two bridges crossed the Missouri River. *State ex rel. Kansas City*, 228 S.W.2d at 767. However, the existence of a method of land travel within the proposed annexation area was part of the basis for finding that the annexation was reasonable, not the basis for finding that the area was contiguous. *Id.*

found that the district complied with the contiguity requirement under the state constitution. *Id.* The court reasoned that the contiguity requirement does not mean that a paved, dry road must connect all parts of a district, nor does it require convenience and ease of travel or travel by terrestrial rather than marine forms of transportation. *Id.*

The separation of one part of a district from another part of a district by a large river does not violate Missouri's constitutional requirement that the district be composed of contiguous territory. The map filed by the commission satisfies the constitutional requirement of contiguity.

■■■ For the population equality and compactness requirements, Plaintiffs have failed to meet their burden of proof in challenging the constitutional validity of the plan. The evidence submitted by Plaintiffs consists of the parties' joint stipulation of facts and the affidavit of Mr. Girouard with supporting exhibits. As part of the affidavit, Mr. Girouard included a proposed map with greater population equality, which Plaintiffs also contend meets the compactness requirement. Plaintiffs' proposed map and other evidence, however, fails to prove that the nonpartisan reapportionment commission's map is unconstitutional, because the creator of the proposed alternative map, Mr. Girouard, did not take into consideration federal law and other recognized factors when drawing the proposed map.

Mr. Girouard used only three criteria in creating his proposed map. In his affidavit, Mr. Girouard specifically stated that:

The instructions I was given to prepare [the proposed map] were to create a map with (a) the smallest possible population deviation range, (b) every district comprised of contiguous territory, and (3) and [sic] each district as compact as possible given the prior two criteria.

Using my expertise with Maptitude, and influenced by these criteria *and no others,* Exhibit F is the best I could do.

(Emphasis added). In contrast, the plan filed by the nonpartisan reapportionment commission indicates that it considered numerous factors in creating its map. The plan consisted of approximately 1,270 pages of supporting documents and maps, including data about and statistical analysis of Missouri's population figures, voting age topography, racial demographics, and other factors. The population figures were provided by the census bureau in the form of "Voter Tabulation Districts," comprised of blocks, block groups, census tracts, and counties, which limit the ability to attain precise population figures when drawing boundary lines. Each of these considerations, as evidenced by the 1,270 page plan filed with the secretary of state, impacts the ability of the nonpartisan reapportionment commission to "as nearly as possible, equal" the ideal population figure.

None of Plaintiffs' evidence, however, addresses these additional factors. First, Plaintiffs' evidence fails to address whether the higher population equality and compactness as shown by the proposed map is possible when considering the other recognized factors. Plaintiffs failed to utilize the 1,270 pages of supporting documents and maps filed with the commission's plan, for example, to show whether the boundary lines in the commission's map were drawn to maintain boundaries of counties, cities, or other political subdivisions. *See Pearson I,* 359 S.W.3d at 40. Nor did Plaintiffs use prior-existing maps to show whether natural boundaries in the territory or historical boundary lines were a consideration. *See Kirkpatrick,* 528 S.W.2d at 426. Plaintiffs failed to utilize any such evidence or other analysis.

Second, Plaintiffs' evidence does not include any data or analysis showing that it complies with federal law requirements, most notably the Voting Rights Act. In fact, Mr. Girouard's affidavit expressly states that he considered "no other" factors in creating his proposed map. While the joint stipulation of facts provides that there was no intent to disfavor any citizens in a suspect class, that stipulation only addresses the map filed by the nonpartisan reapportionment commission, not Plaintiffs' proposed map. Consequently, the record supports the trial court's finding that Plaintiffs failed to prove that it is possible to achieve greater population equality and compactness when considering federal law requirements and other factors. Because Plaintiffs' claim that the plan violates Mo. Const. art. I, secs. 2 and 25 is based on an alleged failure to meet the requirements in art. III, sec. 2, Plaintiffs also have failed to prove clearly and undoubtedly that the plan is unconstitutional on that ground.

## Conclusion

Because the intervenors had unique personal and economic interests at stake, the trial court also did not abuse its discretion in allowing permissive intervention. The trial court did not err in upholding the map under the sunshine law, because the nonpartisan reapportionment commission is a judicial entity that was not acting in an administrative capacity. Finally, Plaintiffs have failed to meet their burden of proving that the plan filed by the nonpartisan reapportionment commission is clearly and undoubtedly unconstitutional under Mo. Const. art. III, sec. 2 or Mo. Const. art. I, sec. 25. The judgment of the trial court is affirmed.

TEITELMAN, C.J., FISCHER and DRAPER, JJ., concur; PRICE, J., concurs in separate opinion filed; RUSSELL and STITH, JJ., concur in opinion of PRICE, J.

WILLIAM RAY PRICE, JR., Judge.

"There is no discretion to violate mandatory provisions of the [c]onstitution...." *Preisler v. Doherty*, 365 Mo. 460, 284 S.W.2d 427, 435 (1955). Legislative bodies are in the business of making policy, and as such, when they enact statutes, they have discretion to consider any and all factors they see as relevant—provided that they do not violate the constitution. I am unable to fully join the principal opinion because it fails to recognize that the Missouri Constitution's mandatory requirements limit the discretion of legislative bodies that draw the state's electoral districts.

I concur in the principal opinion's holdings as to the sunshine law and intervention. I also concur in the principal opinion's finding that Plaintiffs failed to prove that the nonpartisan reapportionment commission's plan violates the Missouri Constitution. Plaintiffs presented no evidence that the plan was not drawn to comply with the Voting Rights Act—a mandatory requirement. This finding alone is a sufficient ground for affirming the trial court's judgment. Once the principal opinion noted that Plaintiffs failed to meet that burden, the opinion could and should have ended.

The principal opinion goes on, however, engaging in unnecessary and dangerous dicta in violation of the doctrine that "we refuse to rule upon constitutional issues unless they are necessary for the decision of the case." *State v. Vienup*, 347 Mo. 382, 147 S.W.2d 627, 631 (1941). *See also State ex rel. State Bd. of Mediation v. Pigg*, 362 Mo. 798, 244 S.W.2d 75, 79 (1951) (accord). In the process, the principal opinion dilutes—if not eviscerates—constitutional requirements safeguarding Missourians' voting rights from gerrymandering.

Article III, section 2 of the Missouri Constitution mandates that each house district be drawn in accordance with three requirements: contiguous territory; population as nearly equal as possible; and districts as compact as may be. The Supremacy Clause, U.S. Const. art VI, cl. 2, requires compliance with federal law, including the Voting Rights Act.

The principal opinion states that the qualifiers "as possible" and "as may be" broaden the definitions of "compact" and "equal population." Thus, noncompact or unequally populated districts become "compact as may be" or "equal as possible" when the noncompactness or inequality is motivated by one of several nonconstitutional factors, including natural and historic boundaries, population density, and other discretionary concerns.[1] But nowhere in the language of our constitution are natural or historic boundaries, population density or any other factors accorded imperative significance, such that they might be weighed against constitutional and federally mandated requirements designed to assure voters' rights to fair electoral districts. While legislative bodies are permitted to consider these nonconstitutional discretionary factors, *their discretion always is limited by mandatory constitutional requirements.* There is no discretion to violate mandatory provisions of the constitution.

### I

The principal opinion's approach overrules the three holdings central to *Pearson v. Koster*, 359 S.W.3d 35 (Mo. banc 2012) (*Pearson I*). In *Pearson I*, this Court stressed the importance of the *mandatory language* of the Constitution: "[T]he applicable standard of review for a court in reviewing an article III, section 45 claim is the language of the constitution itself: whether the General Assembly divided Missouri into districts of '*contiguous territory* as *compact* and as *nearly equal in population* as may be.'" *Id.* at 40 (quoting Mo. Const. art. III, sec. 45) (emphasis added). In *Pearson I*, the Court noted that the "as may be" language recognizes that "compactness and numerical equality cannot be achieved with absolute precision." *Id.* at 39. This is because compactness is "subject, as it must be, to other more *definitely expressed* rules." *Id.* at 38 (quoting *State ex rel. Barrett v. Hitchcock,* 241 Mo. 433, 146 S.W. 40, 61 (1912)) (emphasis added). One such "more definitely expressed rule" is equality in population. *See Barrett,* 146 S.W. at 61 ("[C]ompactness, being of less importance, may, to some extent, yield in aid of securing a nearer approach to equality of representation."). The others are contiguity, which is unqualified and, thus, an "absolute" requirement, and federal laws, including the Voting Rights Act. *See* Principal Opinion at 24–25, 27.

*Pearson I* recognized that in creating redistricting maps, the legislature may take into account "a number of sensitive considerations." *Pearson I,* 359 S.W.3d at 39. *Pearson I* acknowledged that while the legislature could use their discretion to *draw* redistricting maps, the maps *must comply* with mandatory constitutional requirements. *Id. Pearson I* never stated that nonconstitutional factors such as "natural or historical boundaries" or other discretionary considerations could *transform* a map that is noncompact into one that is "compact as may be" and, therefore, constitutionally permissible. Quite the opposite: *Pearson I* reaffirmed

---

1. It is unclear, under the principal opinion, exactly what factors may excuse noncompactness or population equality, or even whether the list of factors is definite or indefinite. *See infra* pp. 37–39.

that the purpose of the written compactness, contiguity, and equal population requirements "is 'to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as "gerrymander".....'" *Id.* at 38 (quoting *Barrett,* 146 S.W. at 61). *Pearson I* made its intention clear in the very next sentence: "The provision requiring compactness of territory, *subject as it must be, to other more definitely expressed rules,* may also, in application, be modified by the requirement of equality in population...." *Id.* at 38 (emphasis added) (quotation omitted).

The second holding in *Pearson I* asserted that the test for compliance is "mandatory and objective, not subjective." *Id.* at 40. In reaching this holding, *Pearson I* departed from prior Missouri cases, including *Preisler v. Kirkpatrick,* 528 S.W.2d 422 (Mo. banc 1975) (*Kirkpatrick II* ), which applied a subjective "honest and good faith" standard. *Pearson I,* 359 S.W.3d at 39. Finally, *Pearson I* rejected *Kirkpatrick II*'s evaluation of the redistricting plan as a whole to determine if it "substantially compl[ies] with the compactness requirement" in favor of a district-by-district constitutional evaluation. *See id.*

## II

The principal opinion allows, as an excuse for failing to adhere to constitutional requirements, the consideration of a number of factors never expressly written in the constitution. The principal opinion also leaves open the possibility that still more factors identified by the United States Supreme Court or courts of other states—in cases not interpreting the language of the Missouri Constitution—might excuse noncompliance with Missouri's compactness requirement. This potentially limitless list of factors is anything but a "definitely expressed rule" embodied in the language of the Missouri Constitution.

By looking to nonconstitutional discretionary factors to determine whether a district is as "nearly equal as possible" or "compact as may be," the principal opinion misconstrues the meaning of the constitution. When ascertaining the meaning of the words "as nearly as possible" and "compact as may be," the primary rule is to "give effect to the intent of the voters" who approved the constitutional language. *See Keller v. Marion Cnty. Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991). The constitution grants the legislature the power to redistrict but places limits on the legislature's discretion:

[T]he Constitution, in express terms, limits the discretion by providing that the [l]egislature shall apportion the state into districts; but in doing so it shall make each district *as nearly equal in population as may be* .... The words italicized show conclusively that it was not the intention of the framers of the [c]onstitution to confer upon the [l]egislature the unlimited power and discretion to form the districts in such shapes and dimensions as it might, in its own opinion, deem proper, nor to give to each a population which it deemed best. Had the framers of the [c]onstitution intended that the [l]egislature should apportion the state into districts according to its own free and untrammeled will, then they would not have used the words of restriction before mentioned. This is too plain for argument.

*Barrett,* 146 S.W. at 54 (emphasis in original).

Politics and policy are subservient to the constitutional requirements of contiguity, compactness, and equal population—not vice versa. *See Doherty,* 284 S.W.2d at 435 ("[C]onstitutional mandate[s] and standards cannot be broken down or rendered

inoperative on the theory of discretionary power.") (quotation omitted). *See also Kirkpatrick v. Preisler,* 394 U.S. 526, 533–34, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (*Kirkpatrick I*) ("Missouri contends that variances were necessary to avoid fragmenting areas with distinct economic and social interests.... But to accept population variances, large or small, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people.").

This does not mean that the General Assembly or other redistricting authority is not *permitted* to consider discretionary factors such as natural boundaries and historical district boundary lines when *drafting* new maps. But because the text of the Missouri Constitution neither requires consideration of these factors nor even mentions them, they cannot excuse failure to comply with expressly stated constitutional requirements.[2] Allowing nonconstitutional discretionary factors to justify noncompliance with clearly expressed con-

stitutional mandates that check legislative discretion is a result so obviously absurd and repugnant to the spirit of the constitutional instrument that it cannot be a reasonable interpretation of the Missouri Constitution. There is no discretion to violate expressly written mandatory provisions of the constitution.[3]

### III

The principal opinion mistakenly cites *Pearson I* for the proposition that factors other than those expressly identified in the constitution may justify noncompactness. Reaffirming the justiciability of challenges to redistricting maps, *Pearson I* stated only that "[m]inimal and practical deviations" from perfect compactness or population equality are permitted "if required to preserve the integrity of the existing lines of our various political subdivisions." *Pearson I,* 359 S.W.3d at 40. Far from promoting nonconstitutional standards, *Pearson I* merely recognized existing political subdivisions because the Missouri Constitution itself discusses county lines in state senate redistricting.[4] To the extent

2. The principal opinion states that "the language used in the constitutional requirements implicitly permits consideration in the redistricting process of" additional factors. Principal Opinion at 28. Its choice of the word "implicitly" is an admission that the constitution says nothing about these additional factors. The gist of the principal opinion's reasoning is that "implicitly permitted" (read: judicially created) factors can override explicit requirements enacted by Missourians in their constitution.

3. Making matters worse, the principal opinion would allow those factors to be picked after the fact. Rather than consistently applying a factor across the state when drawing a map, presumably the court will pick and choose whichever factor might explain a particular legislative aberration. Moreover, the sufficiency of the chosen factor will be left entirely to the imagination of its selector. The system created by the principal opinion is

an invitation to arbitrary and capricious adjudication of redistricting maps. *Cf. Board of Educ. of City of St. Louis v. Missouri State Bd. of Educ.,* 271 S.W.3d 1, 11 (Mo. banc 2008) ("[An entity] acts unreasonably and arbitrarily if its decision is not based on substantial evidence. Whether an action is arbitrary focuses on whether an [entity] had a rational basis for its decision. Capriciousness concerns whether the [entity's] action was whimsical, impulsive, or unpredictable. To meet basic standards of due process and to avoid being arbitrary, unreasonable, or capricious, an [entity's] decision must be made using some kind of objective data rather than mere surmise, guesswork, or 'gut feeling.' An [entity] must not act in a totally subjective manner without any guidelines or criteria.") (quotation omitted).

4. Article III, section 7 of the Missouri Constitution provides that "no county lines shall be crossed except when necessary to add suffi-

that the City of St. Louis also functions as a county, presumably that provision governs it as well. Nonetheless, *Pearson I* is very clear that it is the "language of the constitution" that controls.

The principal opinion cites *Kirkpatrick II*, 528 S.W.2d at 426 (quoting *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)), for the proposition that discretionary factors not written in the constitution can transform a noncompact or unequally populated district into one that is constitutionally permissible. *See* Principal Opinion at 28. Aside from the *Reynolds* quote, the Court cites to no specific language in *Kirkpatrick II* for its assertion, because no such language exists in that case or in any other Missouri precedent. In fact, *Kirkpatrick II* itself found two districts to be noncompact. *Kirkpatrick II*, 528 S.W.2d at 426–27 ("[A]ll districts, except the sixth in St. Louis, and the 33rd because it thrusts a narrow appendage from the middle of its body into the heart of Greene County, are within acceptable limits of compactness."). Although *Kirkpatrick II* upheld the plan, the Court did not find those districts to be as "compact as may be." Rather, the *Kirkpatrick II* Court stated that because only two of thirty-four districts were noncompact, the plan as a whole "substantially compl[ied] with the compactness requirement," *id.* at 427, and that the reapportionment commission made an "honest and good faith effort to construct senatorial districts as compact as may be," *id.* at 426.[5]

Moreover, the *Reynolds* quote cited by the principal opinion is itself taken out of context. When affirming the right to equally populated voting districts, the Supreme Court of the United States did state that "[i]ndiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Reynolds*, 377 U.S. at 578–79, 84 S.Ct. 1362. The court continued, however: "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. *But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities* from population-based representation." *Id.* at 579–80, 84 S.Ct. 1362 (emphasis added) (footnote omitted). Thus, *Reynolds* actually supports *Pearson I*: the legislature may take nonconstitutional discretionary factors into consideration when drafting a map, but if it drafts a noncompact map, those nonconstitutional factors cannot transform the noncompact map into one as "compact as may be." Rather, only when compliance with mandatory federal law and other enumerated requirements in Missouri's Constitution—contiguity and equality in population—necessitates noncompactness may a noncompact district be considered "compact as may be."[6] More simply: noncompactness is allowed only when necessary to enable compliance with Missouri's contiguity,

---

cient population to a multi-district county or city to complete only one district which lies partly within such multi-district county or city so as to be as nearly equal as practicable in population."

5. As noted above, in *Pearson I*, this Court rejected the notion that a voter's right to compactness in one district could be overcome by compactness in other districts.

6. A similar analysis holds true for an unequally populated map.

equal population, or county boundary requirements or federal law. There is no discretion to violate mandatory provisions expressly written in the constitution.

## IV

It is telling that, despite its pages of dicta, the principal opinion never states a clear standard or test for what plaintiffs must prove in a compactness or population equality challenge. Instead, it discusses pieces of what sound like different tests throughout the opinion. For example:

> The plaintiff also must prove that one or more districts are not nearly as equal in population as possible and not as compact as may be considering the *additional factors* that may have been *important considerations* in the challenged map.
>
> In this regard, the issue of whether the constitutional requirements are satisfied is determined objectively, requiring no proof of the subjective intent of the reapportionment commission. *See Pearson I*, 359 S.W.3d at 40. To meet the objective standard, a plaintiff must present, at a minimum, evidence demonstrating not only that the proposed alternative has greater population equality and compactness, but also that it complies with federal law.

Principal Opinion at 30–31 (emphasis added). Several pages later, the principal opinion states:

> Plaintiffs' proposed map and other evidence, however, fail to prove that the nonpartisan reapportionment commission's map is unconstitutional, because the creator of the proposed alternative map, Mr. Girouard, did not take into consideration *federal law and other recognized factors* when drawing the proposed map.

*Id.* at 31–32 (emphasis added). At points, the principal opinion suggests that "natural and historical boundaries" are among the factors plaintiffs are obligated to consider, *see id.* at 28–29, 29, 32–33, as is "population density," *see id.* at 28–29. Elsewhere, it suggests the list of factors might include "preserving the cores of prior districts, maintaining communities of interest, and avoiding contests between incumbents." *Id.* at 30. Finally, the principal opinion faults Plaintiffs for failing to "address" a host of factors that the reapportionment commission "considered," including "data about and statistical analysis of Missouri's population figures, voting age topography, racial demographics," and last, but not least, "other factors." *Id.* at 32.

The principal opinion not only fails to provide a definitive list of factors plaintiffs must disprove but also fails to define any of the factors it does list. The Court is unable or unwilling to articulate how natural and historical boundaries, population density, etc., figure into the analysis except to say that they are "considerations" or "factors that may have been considered."

The Court further confuses its standard by characterizing it as an objective test—as it must; in *Pearson I*, this Court declared the constitutional standards governing the redistricting process to be "mandatory and objective, not subjective." *Pearson I*, 359 S.W.3d at 40. But the principal opinion's repeated use of the word "considerations" and "considers" belies this characterization. If the inquiry involves what the legislative body has considered, or what was an important consideration was during redistricting, then it is an inquiry into the legislative body's mental state, and thus the standard is subjective.[7] The principal opinion states in one

7. *See* BLACK'S LAW DICTIONARY 1535 (9th ed. 2009) ("[O]bjective standard.... A legal stan-

sentence that Plaintiffs must "consider[ ] the additional factors *that may have been important considerations* in the challenged map," and in the next states this "requir[es] no proof of *the subjective intent* of the reapportionment commission." Principal Opinion, at 29–30. The two quoted sentences articulate two contradictory legal standards, the former subjective and the latter objective.

Theoretically, additional factors could be incorporated into a truly objective standard, but only if this Court definitively lists these factors or at least explains how to ascertain them independently of the legislative body's mental state. As it stands, all anyone knows about the standard to which the principal opinion holds redistricting maps is that maps may ignore constitutional requirements so long as the drafters took into consideration any considerations that they may have considered. The principal opinion insists that this is an objective standard. It is not. It is very close to being no standard at all.

## V

Two obvious problems arise from the principal opinion's approach. First, it weakens Missourians' constitutional rights, preserved in the language of the constitution, to live in compact, contiguous, and equally populated voting districts. The principal opinion allows subjective, discretionary factors not mentioned in the constitution to trump these express requirements. This effectively writes the compactness and population equality provisions out of the constitution, despite the maxim that "[e]very word in a constitutional provision is assumed to have effect and meaning...." *Ensor v. Dir. of Revenue,* 998 S.W.2d 782, 784 (Mo. banc 1999). The principal opinion's approach dilutes our constitution's vaccine against gerrymandering and reduces it to placebo.

The second problem is tied to the first. The principal opinion does not list or define all the factors that may override the compactness requirement. This leaves the burden on a plaintiff challenging the plan to prove that the noncompactness did not arise from an infinite number of unspecified factors not even raised by the state as defenses. This burden is so onerous as to all but render redistricting challenges nonjusticiable and constitutional rights unenforceable. Plaintiffs would be faced with the Kafkaesque challenge of meeting a burden of proof that is not specified and that roves and floats with the whim and imagination of the reviewing judge.[8]

The principal opinion bestows on legislative bodies discretion to subordinate the

---

dard that is based on conduct and perceptions external to a particular person.... [S]ubjective standard.... A legal standard that is peculiar to a particular person and based on the person's individual views and experiences."). Cf. *Hodges v. American Bakeries Co.,* 412 S.W.2d 157, 162 (Mo. banc 1967) (explaining that subjective standards are "personal" and "individual" while objective standards are "external").

8. Interpreting "as may be" and "as possible" to allow for nonconstitutional discretionary considerations could be consistent with the United States Supreme Court's framework that shifts the burden to the state to "show with some specificity that a particular objec-

tive required the specific deviations in its plan." *Karcher v. Daggett,* 462 U.S. 725, 741, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). But, even when using such a test, the Supreme Court required states to apply proffered considerations consistently "throughout the state in a systematic, not an *ad hoc* manner." *Id.* (quoting *Kirkpatrick I,* 394 U.S. at 535, 89 S.Ct. 1225).

At the very least, if the principal opinion insists upon diluting the rights expressly stated in the constitution with discretionary factors, the burden should be shifted to the state to raise and prove those issues. Several states shift the burden between plaintiff and state when population equality is challenged. *See, e.g., Egan v. Hammond,* 502 P.2d 856,

Constitution to the political pressures of the day. But the job of the Supreme Court is to honor and protect the rights claimed by the people of Missouri in their constitution, not to finesse those rights away. This is especially true when the case involves elections, which are the life's breath of democracy. As was said in *Reynolds v. Sims:*

> We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.

377 U.S. at 566, 84 S.Ct. 1362.

---

867 (Alaska 1972); *In re Legislative Districting of Gen. Assembly,* 193 N.W.2d 784, 791, *supplemented by* 196 N.W.2d 209 (Iowa 1972), *amended sub nom. Matter of Legislative Districting of Gen. Assembly,* 199 N.W.2d 614 (Iowa 1972); *Jackman v. Bodine,* 55 N.J. 371, 262 A.2d 389, 395 (1970); *Opinion of the Justices,* 353 Mass. 790, 230 N.E.2d 801, 804 (1967).

Other states have expanded burden-shifting to redistricting challenges beyond population variance. *See, e.g., In re Reapportionment of the Colorado Gen. Assembly,* 828 P.2d 185 (Colo.1992); *Fonfara v. Reapportionment Comm'n,* 222 Conn. 166, 610 A.2d 153 (1992); *Schrage v. State Bd. of Elections,* 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (Ill.1981); *In re Legislative Districting of Gen. Assembly,* 193 N.W.2d at 791; *In re Legislative Districting of State,* 370 Md. 312, 805 A.2d 292 (2002); *In re Livingston,* 96 Misc. 341, 160 N.Y.S. 462, 469 (N.Y.Sup.Ct.1916); *Stephenson v. Bartlett,* 357 N.C. 301, 582 S.E.2d 247 (2003); *State ex rel. Lockert v. Crowell,* 656 S.W.2d 836 (Tenn. 1983); *In re Reapportionment of Towns of Hartland, Windsor, and W. Windsor,* 160 Vt. 9, 624 A.2d 323 (1993). And Missouri has employed burden-shifting in cases outside the redistricting context. For example, Missouri courts shift the burden in cases involving special laws. *See City of Springfield v. Sprint Spectrum, L.P.,* 203 S.W.3d 177, 186 (Mo. banc 2006) (requiring the party defending the statute to "demonstrate a *substantial justification* ") (emphasis in original).