

# SUPREME COURT OF MISSOURI
## en banc

CLARA FAATZ, et al.,             )
                                          )
                 Appellants,      )
                                          )
v.                                         )       No. SC100277
                                          )
JOHN ASHCROFT, MISSOURI     )
SECRETARY OF STATE,          )
                                          )
                 Respondent.     )

*Opinion issued February 14, 2024*

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
The Honorable Jon E. Beetem, Judge

Clara Faatz and William Caldwell ("Appellants") appeal the circuit court's judgment on their declaratory judgment action in favor of John Ashcroft, in his official capacity as Secretary of State of Missouri (the "Secretary"). On appeal, Appellants claim the circuit court erred by finding the Missouri Senate redistricting plan ("Senate Map") prepared by the judicial redistricting commission ("Judicial Commission") met the constitutional requirements for redistricting. This Court finds the circuit court did not err in finding the Senate Map constitutional. Accordingly, the circuit court's judgment is affirmed.

**Legal Background**

The Missouri Constitution allows for 34 members of the Missouri Senate who are elected by qualified voters of their senatorial districts. Mo. Const. art. III, sec. 5. The 34 senatorial districts are established and apportioned by the procedures fixed in the constitution. *Id.* Missouri redraws its state legislative districts every 10 years, following each United States census. Mo. Const. art. III, sec. 3(c). The constitution requires the governor to appoint a senate independent bipartisan citizens commission tasked with drawing a redistricting map. Mo. Const. art. III, sec. 7. If the citizens commission fails to submit an agreed upon map to the Secretary of State within six months of the citizens commission's appointment, the constitution requires a judicial redistricting commission, consisting of six appellate court judges appointed by this Court, to take over the task of creating a redistricting map. Mo. Const. art. III, sec. 7(f). The judicial redistricting commission must sign and file a redistricting plan and map, voted on by a majority of the judicial redistricting commission, with the Secretary of State within 90 days of the citizens commission's discharge. *Id.*

The Missouri Constitution provides criteria the commissions must follow in creating a redistricting map. Article III, section 3 provides the parameters for redistricting the state House, and section 7 of article III incorporates the methods set forth in section 3 to redistricting the state Senate. Article III, section 3 provides multiple relevant factors to redistricting and directs use of "the following methods, listed in order of priority":

2

(1) Districts shall be as nearly equal as practicable in population, and shall be drawn on the basis of one person, one vote. Districts are as nearly equal as practicable in population if no district deviates by more than one percent from the ideal population of the district, as measured by dividing the number of districts into the statewide population data being used, except that a district may deviate by up to three percent if necessary to follow political subdivision lines consistent with subdivision (4) of this subsection ["**equal population**"];

(2) Districts shall be established in a manner so as to comply with all requirements of the United States Constitution and applicable federal laws, including, but not limited to, the Voting Rights Act of 1965 (as amended). The following principles shall take precedence over any other part of this constitution: no district shall be drawn in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color; and no district shall be drawn such that members of any community of citizens protected by the preceding clause have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice ["**federal constitutional and statutory criteria**"];

(3) Subject to the requirements of subdivisions (1) and (2) of this subsection, districts shall be composed of contiguous territory as compact as may be. Areas which meet only at the points of adjoining corners are not contiguous. In general, compact districts are those which are square, rectangular, or hexagonal in shape to the extent permitted by natural or political boundaries ["**compactness**"];

(4) To the extent consistent with subdivisions (1) to (3) of this subsection, communities shall be preserved. Districts shall satisfy this requirement if district lines follow political subdivision lines to the extent possible, using the following criteria, in order of priority. First, each county shall wholly contain as many districts as its population allows. Second, if a county wholly contains one or more districts, the remaining population shall be wholly joined in a single district made up of population from outside the county. If a county does not wholly contain a district, then no more than two segments of a county shall be combined with an adjoining county. Third, split counties and county segments, defined as any part of the county that is in a district not wholly within that county, shall each be as few as possible. Fourth, as few municipal lines shall be crossed as possible ["**community preservation**"];

(5) Districts shall be drawn in a manner that achieves both partisan fairness and, secondarily, competitiveness, but the standards established by subdivisions (1) to (4) of this subsection shall take precedence over partisan

fairness and competitiveness. "Partisan fairness" means that parties shall be able to translate their popular support into legislative representation with approximately equal efficiency. "Competitiveness" means that parties' legislative representation shall be substantially and similarly responsive to shifts in the electorate's preferences ["**partisan fairness/competitiveness**"].

Although the constitution mandates the consideration of these methods in order of priority, the constitution's goals "cannot be achieved with absolute precision." *Johnson v. State*, 366 S.W.3d 11, 25 (Mo. banc 2012) (quoting *Pearson v. Koster*, 359 S.W.3d 35, 39 (Mo. banc 2012) (*Pearson I*)). Put simply, "there is no perfect map"; therefore, the constitution "does not require absolute perfection in a map[.]" *Id.* Given "[t]hese maps could be drawn in multiple ways, all of which might meet the constitutional requirements[,]" this Court has recognized that "[t]hese decisions are political in nature and best left to political leaders, not judges." *Pearson I*, 359 S.W.3d at 39. This Court has thus held it "fundamental" that "redistricting is predominately a political question." *Id.*; *c.f. Baker v. Carr*, 369 U.S. 186, 217 (1962) (holding political questions involve "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion").

### Factual and Procedural Background

Following the 2020 census, the Governor appointed a citizens commission to develop a new Senate redistricting map pursuant to article III, section 7 of the Missouri Constitution. The citizens commission failed to agree on a map to file with the Secretary. On January 11, 2022, this Court appointed a Judicial Commission to draw a new Senate map, pursuant to article III, section 7 of the Missouri Constitution. In March 2022, the Judicial Commission released the Senate Map at issue in this appeal.

4

Appellants sued the Secretary and the Judicial Commission to challenge the Senate Map. Appellants sought a declaration that the Senate Map violated the community preservation requirement in article III, section 3(b)(4) of the Missouri Constitution by splitting Buchanan County into two separate senatorial districts and the City of Hazelwood into two separate senatorial districts. Appellants also sought to enjoin the Secretary from using the Senate Map for "any purpose."

The circuit court dismissed the Judicial Commission from the action and held a bench trial on Appellants' claims against the Secretary. Following the trial, the circuit court entered judgment for the Secretary, finding the Senate Map constitutional and, alternatively, that Appellants failed to carry their burden to prove the Senate Map unconstitutional.

Appellants now appeal, requesting this Court reverse the circuit court's judgment and, pursuant to article III, section 7(i) of the Missouri Constitution, remand for the circuit court to enter a judgment adjusting those districts necessary to bring the Senate Map into constitutional compliance.

## Jurisdiction

This Court has "exclusive appellate jurisdiction" over "[a]ny action expressly or implicitly alleging that a redistricting plan violates [the Missouri] Constitution." Mo. Const. art. III, sec. 7(i). Appellants expressly allege the Senate Map violates the constitution. This Court, therefore, has jurisdiction.

5

**Standing**

To challenge a redistricting map, "[o]nly an eligible Missouri voter who sustains an individual injury by virtue of residing in a district that exhibits the alleged violation, and whose injury is remedied by a differently drawn district, shall have standing." *Id.*

The Senate Map splits Buchanan County between districts 12 and 34 and splits Hazelwood between districts 13 and 14. Appellant Caldwell is a Missouri voter residing in senate district 12 (Buchanan County). Appellant Faatz is a Missouri voter residing in senate district 13 (Hazelwood). Appellants allege splitting Buchanan County between districts 12 and 34 and splitting the Hazelwood between districts 13 and 14 violates the community preservation requirement of the Missouri Constitution under article III, section 3(b)(4). Each Appellant lives in a district in which a community has been split in alleged violation of the Missouri Constitution and, therefore, has standing to challenge the Senate Map.

**Standard of Review**

"In appeals from a court-tried civil case, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Johnson*, 366 S.W.3d at 18 (internal quotation omitted). "In reviewing a particular issue that is contested, the nature of the appellate court's review is directed by whether the matter contested is a question of fact or law." *Id.* (internal quotation omitted). "When the facts relevant to an issue are contested, the reviewing court defers to the trial court's assessment of the evidence" and "defers to the trial court's determination of credibility." *Id.* at 18-19 (internal quotation

6

omitted). "[W]hen the evidence is uncontested … no deference is given to the trial court's findings." *Id.* at 19 (internal quotation omitted).

The constitution provides courts limited power over challenges to a redistricting plan:

> Any action expressly or implicitly alleging that a redistricting plan violates this Constitution, federal law, or the United States Constitution shall be filed in the circuit court of Cole County and shall name the body that approved the challenged redistricting plan as a defendant. … If the court renders a judgment in which it finds that a completed redistricting plan exhibits the alleged violation, its judgment shall adjust only those districts, and only those parts of district boundaries, necessary to bring the map into compliance.

Mo. Const. art. III, sec. 7(i). Pursuant to the constitution, this Court's "single function" in hearing a redistricting challenge on appeal "is to determine whether the constitutional [or federal law] requirements … were followed[.]" *State ex rel. Teichman v. Carnahan*, 357 S.W.3d 601, 603 (Mo. banc 2012). This Court will not interfere with the political process by finding a redistricting map unconstitutional "unless the plaintiff proves that it clearly and undoubtedly contravenes the constitution." *Johnson*, 366 S.W.3d at 20 (alteration omitted) (internal quotation omitted). The Court's role is further limited to reviewing the constitutionality of the particular senate districts alleged to exhibit a violation. Mo. Const. art. III, sec. 7(i). Finally, the Court asks only if the constitutional requirements were followed, not whether a redistricting commission acted reasonably or prudently. *Teichman*, 357 S.W.3d at 603; *Pearson v. Koster*, 367 S.W.3d 36, 46 (Mo. banc 2012) (*Pearson II*).

"In a case challenging a reapportionment plan, this Court reviews the plan under identical standards for review of a statute[.]" *Johnson* 366 S.W.3d at 19. The plan "is

7

assumed to be constitutional and will not be held unconstitutional unless the plaintiff proves that it clearly and undoubtedly contravenes the constitution." *Id.* at 20 (alteration omitted) (internal quotation omitted). "This Court will uphold the plan unless it plainly and palpably affronts fundamental law embodied in the constitution, and doubts will be resolved in favor of the constitutionality of the plan." *Id.* (internal quotation omitted).

## Analysis

Appellants raise eight points on appeal. In Point I, they contend the circuit court erred by applying a reasonableness standard to the map drawing process. Appellants argue in Point II the circuit court erred by declining to rely on article III, section 3(b)(1) in entering its judgment. Appellants argue in Points III and IV that the circuit court erred by failing to follow the plain language of the constitution in finding compactness takes priority over community preservation and a mathematical calculation can be an appropriate means to determine compactness. In Points V and VI, Appellants take issue with the circuit court's finding that Appellants failed to meet their burden of proving deviations in the Senate Map were not due to consideration of recognized factors. Finally, Appellants' arguments in Points VII and VIII are related to the Judicial Commission's dismissal from the lawsuit and the circuit court's quashing of discovery on the Judicial Commission.

*Point I: Appellants did not preserve a challenge to the judgment's language*

Appellants argue the circuit court erred in applying a "reasonableness" standard to determine whether the Senate Map violated the constitution. Appellants contend the circuit court may apply only the objective standard contained in the constitution itself,

8

*i.e.*, objectively determining whether the five methods of article III, section 3(b) are satisfied.

Rule 78.07(c) provides: "In all cases, allegations of error relating to the form or language of the judgment … must be raised in a motion to amend the judgment in order to be preserved for appellate review." Appellants challenge the language of the judgment, specifically the circuit court's use of "reasonableness," but did not file a motion to amend the judgment. Accordingly, this point is not preserved for appellate review. Point I is denied.

*Point II: Appellants failed to preserve an equal population claim*

Appellants argue the Senate Map violated article III, section 3(b)(1), equal population, because the populations of three of the districts containing Buchanan County and Hazelwood deviate from the ideal population by more than one percent, which, according to Appellants, is permissible only to preserve political subdivisions. Appellants argue this point was preserved through their amended petition.[1] Appellants

---

[1] Appellants argue "[t]he fact that [they] did not specifically say their action was brought under one of the several subsections of Article III, Section 3 requiring preservation of communities did not waive the legal theory." Instead, Appellants contend "[a] court should ignore what [they] call their theory and instead look at the pled facts." Appellants justify this assertion by citing *Thomas v. City of Kansas City*, 92 S.W.3d 92, 96 (Mo. App. 2002), a case that includes *no* constitutional claims. For more than 100 years, this Court has held constitutional claims not raised at the first opportunity are not preserved for appellate review. *Barber Asphalt Pav. Co. v. Ridge,* 68 S.W. 1043, 1046 (Mo. 1902); *Lohmeyer v. St. Louis Cordage Co.*, 113 S.W. 1108, 1110 (Mo. 1908); *Miller v. Connor*, 157 S.W. 81, 83 (Mo. 1913). The rationale underlying the constitutional claim preservation requirements is "to prevent surprise to the opposing party and permit the trial court an opportunity to fairly identify and rule on the issue." *Mayes v. Saint Luke's Hosp. of Kan. City*, 430 S.W.3d 260, 266 (Mo. banc 2014). The position Appellants articulate in their brief is not consistent with this precedent and, if allowed, would ***promote*** surprise to the

also contend claims under section 3(b) are interrelated such that raising a section 3(b)(4) claim inherently raises a 3(b)(1) claim. Alternatively, Appellants claim this issue was tried by either express or implied consent.

To preserve a constitutional claim for review, appellants must:

(1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated, such as by explicit reference to the article and section or by quotation of the provision itself; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review.

*Mayes*, 430 S.W.3d at 266 (internal quotation omitted).

Appellants first argue the equal population issue was raised in their amended petition because they quoted from section 3(b)(1) in the amended petition. But, as Appellants ultimately conceded at oral argument, a plain reading of the amended petition easily confirms this claim was not preserved.[2] While the amended petition does reference the equal population provision in a section titled "Constitutional Criteria for Drawing Legislative District Maps," Appellants fail to cite section 3(b)(1) in their factual allegations section, "The New Senate Map Does Not Comply with Constitutional Requirements," or in Counts I or II. Instead, Appellants' factual allegations focus solely on the community preservation requirements. For instance, Appellants allege they "are

___

opposing party and ***prevent*** the circuit court from fairly identifying and ruling on constitutional issues. Even considering the facts pleaded in the amended petition, however, Appellants failed to plead any ***facts*** relevant to section 3(b)(1).

[2] At oral argument, counsel for Appellants conceded they did not preserve a population deviation claim under section 3(b)(1) through their pleadings or at trial, stating "the argument has always been (b)(4)." Because preservation is a legal conclusion, the Court is not bound by Appellants' concession. *See* Rule 78.07(b).

10

entitled to a senate map where communities are preserved." Appellants allege a multitude of facts showing the violation of the community preservation requirement, including that the Senate Map divides Buchanan County and Hazelwood, that the Senate Map divides communities, and that it is possible to design a map in a way that does not split Buchanan County or Hazelwood. By contrast, nowhere in Appellants' amended petition do they state any facts showing the violation of the population provision.[3] Appellants must separately raise section 3(b)(1) and 3(b)(4) claims because they are independent constitutional claims. Appellants did not raise a section 3(b)(1) claim at the first available opportunity or plead facts alleging a violation of the population provision; therefore, Appellants did not preserve any section 3(b)(1) claim.

Appellants next contend that, because claims arising under section 3(b) are so intertwined, raising a community preservation provision claim inherently raises a population provision claim. Specifically, Appellants argue that, because subdivisions (1), (3), and (4) of section 3(b) "mention the concept" of "splitting political subdivisions," raising one of these issues necessarily raises the other issues. While Appellants argue on appeal that the provisions are inherently intertwined, at trial, Appellants made statements such as "the issue here is … it is ***not about any of the factors except number (4)***," indicating they believed each subdivision was a separate claim.

---

[3] Appellants do allege their own proposed map ***meets*** the requirements of the population provision. But Appellants make no specific factual allegation the Senate Map ***violates*** the population provision. Without specifically stating how a constitutional right was denied, "it is simply untenable to argue that the circuit court was fairly presented the opportunity to decide this issue." *Peters v. Johns*, 489 S.W.3d 262, 269 (Mo. banc 2016).

11

It is true that subdivisions (1) and (4) cross-reference each other and that subdivision (1) refers to following political subdivision lines. The community preservation provision also references the population provision, among others: "To the extent consistent with subdivisions (1) to (3) of this subsection, communities shall be preserved." The reference in subdivision (4) to subdivisions (1) and (3) reinforces the subdivisions are listed in order of priority. Nothing in the language of these subdivisions suggests that *every time* community preservation is challenged in a district in any way, the equal population of the district and compactness of the district are also challenged by implication. [4] To conclude otherwise would violate this Court's precedent establishing that parties must "*designate specifically* the constitutional provision claimed to have been violated" and "*state the facts* showing the violation." *Mayes*, 430 S.W.3d at 266 (emphasis added). The rationale underlying the constitutional claim preservation

---

[4] As the dissenting opinion explains, pursuant to the language in article III, section 3(b)(1), "When a district has a population deviation of more than one percent but less than three percent, it violated *the equal population requirement in article III, section 3(b)(1)* unless the deviation was caused by following political subdivision lines in the manner set out in (and following in order the four criteria described in) article III, section 3(b)(4)." (Emphasis added). The dissenting opinion, however, erroneously concludes that an equal population deviation in an unpreserved community automatically "violates both section 3(b)(4) and 3(b)(1)" thereby preserving both claims. But article III, section 3(b)(4) states, "*To the extent consistent with subdivisions (1)* to (3) of this subsection, communities shall be preserved. Districts shall satisfy this requirement if district lines follow political subdivision lines to the extent possible, *using the following criteria*, in order of priority[.]" (Emphasis added). Appellants did not argue in their amended petition or in the circuit court that their communities were not *preserved consistent with subdivision (1)* – i.e. that their communities were unpreserved due to an equal population deviation; rather, they asserted that their communities were not preserved because their district lines did not follow the political subdivision lines of a county (Buchanan) and a municipality (Hazelwood) when they could have. It is incumbent on the Appellants to specifically raise each alleged violation as a separate claim.

requirements is "to prevent surprise to the opposing party and permit the trial court an opportunity to fairly identify and rule on the issue." *Id.* "The purpose of a pleading is to limit and define the issues to be tried in a case and [to] put the adversary on notice thereof." *Smith v. City of St. Louis,* 395 S.W.3d 20, 24 (Mo. banc 2013) (alteration in original) (quoting *City of St. Joseph, Mo. v. St. Joseph Riverboat Partners*, 141 S.W.3d 513, 516 (Mo. App. 2004)). Raising a community preservation claim does not automatically put an opposing party on notice of an equal population claim. Section 3 claims are not so intertwined that raising a claim under one provision of section 3 incorporates all other enumerated provisions.[5]

Finally, Appellants briefly argue that, even if not presented to the circuit court, the equal population issue was actually tried by either express or implied consent. Assuming without deciding Rule 55.33 can apply to constitutional claims, Appellants fail to demonstrate their equal population claim was tried by express or implied consent. Rule 55.33(b) provides, in relevant part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues

---

[5] Because the subdivisions of section 3(b) cross-reference many other subdivisions, following Appellants' logic, any challenge brought under subdivision (4) must inherently challenge subdivisions (1), (2), and (3) such that it would never be necessary to enumerate these latter subdivisions. Prior to filing their amended petition, though, Appellants' initial petition included a claim under subdivision (2), specifically referenced that provision, and showed facts relevant to the alleged violation. Appellants' logic would open the door to allow provisions of section 3(b) that are mentioned only tangentially in the pleadings or at trial to be preserved for appeal without an adequate record.

13

may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

A review of the record reveals no express agreement between Appellants and the State to try a claim under section 3(b)(1). Additionally, at trial, Appellants represented they were trying only the political subdivision issue. During opening statements, Appellants stated, "all three of these [districts] deviate by more than 1 percent. … ***So that kicks us into the discussion we're really here about which is the political subdivisions***." Appellants also said "the issue here is … it is ***not about any of the factors except number (4)***." "[A] point is preserved for appellate review only if it is based on the same theory presented at trial." *State v. Rice*, 573 S.W.3d 53, 63 (Mo. banc 2019) (alteration in original) (internal quotation omitted). Appellants' theory at trial was different from what they are now submitting to this Court. Further, Appellants did not request to amend the pleadings to conform to the evidence during or after trial. Additionally, Appellants' pleadings and actions led the State to move for judgment at the close of Appellants' case based on section 3(b)(4) alone. Finally, based on its reading of the pleadings and the evidence and argument presented at trial, the circuit court concluded "the issue of whether Senate Districts … violate the equal population provision has not been tried by either express or implied consent." This Court, reviewing the record and pleadings, finds Appellants did not preserve a claim under section 3(b)(1). Point II is denied.

*Points III and IV: The circuit court followed the plain meaning of the constitution*

Appellants argue in Points III and IV that the circuit court erred by failing to follow the plain language of the constitution by finding compactness takes priority over

14

community preservation. Appellants similarly argue the circuit court erred by using a mathematical calculation to determine the compactness of the Senate Map and Appellants' proposed map.

Constitutional interpretation is a question of law this Court reviews *de novo*. *Schweich v. Nixon*, 408 S.W.3d 769, 773 (Mo. banc 2013). "Words used in constitutional provisions are interpreted to give effect to their plain, ordinary, and natural meaning." *Wright-Jones v. Nasheed*, 368 S.W.3d 157, 159 (Mo. banc 2012).

First, Appellants argue the circuit court erred by finding that compactness, article III, section 3(b)(3), is given a higher priority than community preservation, article III, section 3(b)(4). Article III, section 3(b)(3) states:

> Subject to the requirements of subdivisions (1) and (2) of this subsection, districts shall be composed of contiguous territory as compact as may be. Areas which meet only at the points of adjoining corners are not contiguous. In general, compact districts are those which are square, rectangular, or hexagonal in shape to the extent permitted by natural or political boundaries[.]

Appellants argue the language "to the extent permitted by natural or political boundaries" demonstrates community preservation in districts should take priority over compactness. Appellants' argument, in other words, is that "a district need ***not*** be compact if following political or natural boundaries is the reason it is not." This construction is erroneous.

The plain text of the constitution states the methods for redistricting are "listed in order of priority." Mo. Const. art. III, sec. 3(b). The plain meaning of article III, section 3(b) is that compactness in subdivision (3) is given a higher priority than preserving communities in subdivision (4). Appellants argue that, because a portion of subdivision

15

(3) references political boundaries, maintaining political boundaries rises to the same level of priority as compactness, if not higher. A plain reading of the provision reveals the flaw in Appellants' argument. The reference "to the extent permitted by natural or political boundaries" in article III, section 3(b)(3) means that, if a district is not square, rectangular, or hexagonal because the district's perimeter follows a natural or political boundary, the district does not necessarily fail subdivision (3)'s compactness requirement. A district still must be as compact as possible, but may follow natural or political boundaries without necessarily becoming **un**compact.[6]

Article III, section 3(b)(4) states: "***To the extent consistent with subdivisions (1) to (3)*** of this subsection, communities shall be preserved." (Emphasis added). The plain meaning of this phrase further clarifies that preserving communities is subordinate to the preceding methods for redistricting.

Finding the plain language of the constitution requires the methods for redistricting be prioritized as listed, compactness (subdivision (3)) takes priority over preserving communities (subdivision (4)). Appellants raise other arguments in the body of their argument not addressed in the point relied on; therefore, those issues are not preserved for appellate review. Rule 84.04(e). Point III is denied.

---

[6] Further, subdivision (3) also mentions natural boundaries, which are not included as a constitutional method for redistricting. It is evident, therefore, that the reference to "natural or political boundaries" is not directly related to preserving communities discussed in subdivision (4) and was not meant to somehow elevate subdivision (4) to the priority level of subdivision (3).

16

Appellants similarly argue in Point IV that the circuit court erred by using mathematical calculation to compare the compactness of the Senate Map and Appellants' proposed map. Appellants argue the constitution requires compactness to be determined by "visually assess[ing] the shapes of districts and then consider[ing] whether those districts respect political subdivisions."

The requirements for compactness state:

> [D]istricts shall be composed of contiguous territory as compact as may be. Areas which meet only at the points of adjoining corners are not contiguous. In general, compact districts are those which are square, rectangular, or hexagonal in shape to the extent permitted by natural or political boundaries[.]

Mo. Const. art. III, sec. 3(b)(3). The plain language of this provision requires the shapes of districts generally to be shaped like certain polygons: squares, rectangles, or hexagons. Section 3(b)(3) also recognizes there may be some variation to these shapes because districts should be "as compact as may be" and "[i]n general" shaped like certain polygons "to the extent permitted by natural or political boundaries." The constitution incorporates geometry into its plain language by requiring districts to resemble certain shapes. Geometry is "a branch of mathematics that deals with the measurement, properties, and relationships of points, lines, angles, surfaces, and solids." Geometry, *Webster's Third New International Dictionary* (2002). The plain language of the constitution requires districts to take particular shapes, when possible. Each shape listed in the constitution has unique mathematical properties.[7]

---

[7] For example, a square is "a rectangle with all four sides equal." Square, *Webster's Third New International Dictionary* (2002).

17

At trial, experts for both the Secretary and Appellants used mathematical formulas to analyze compactness. The Secretary's expert relied on Convex Hull scores, which express how closely the districts resembled the shapes listed in subdivision (3). In weighing the evidence, the circuit court found the Secretary's expert to be "well qualified based on his education and experience to provide opinions on legislative map drawing." Based on the expert's testimony, the circuit court further found, "the higher the Convex Hull score, the more it complies with the Missouri Constitution's compactness criteria." As to Appellants' expert, the circuit court found that he was not helpful because he could not testify as to how the computer program on which he relied calculated its results.

Using a mathematical formula to determine how closely the shape of the districts matched these properties required by the constitution is not erroneous.[8] Point IV is denied.

*Points V and VI: The circuit court applied the correct burden to Appellants, and its findings were supported by substantial evidence*

Appellants argue in Point V that the circuit court erred by requiring them to show any districts deviating from population or compactness requirements in the Senate Map did not result from consideration of recognized factors. Appellants contend this burden

---

[8] In *Pearson II*, the parties stipulated to eight statistical tests to measure compactness. 367 S.W.3d at 55. This Court noted, "[B]oth Plaintiffs' and Defendants' experts testified that such measures are relevant to the evaluation of compactness. Therefore, they could have been a factor relied on by the trial court." *Id.* at 55 n.18. While the compactness provision of the constitution was amended between *Pearson II* and this case, the current language does not prohibit the use of mathematical calculation. Similar to *Pearson II*, the Secretary's expert explained the use of a Convex Hull score and how it was relevant to measuring compactness. The circuit court properly found the score relevant.

no longer applies because the standard was articulated in *Johnson*, which was decided based on a previous constitutional redistricting scheme. Appellants further contend in Point VI that, even if the circuit court applied the correct standard, they submitted uncontroverted evidence establishing that there was no other redistricting factor ***requiring*** splitting Buchanan County or Hazelwood; therefore, the circuit court's finding was erroneous.

Which burden of proof applies at trial is a question of law this Court reviews *de novo*. *Pearson II*, 367 S.W.3d at 43. For redistricting cases, this Court has previously held it "will uphold [a redistricting] plan unless it plainly and palpably affronts fundamental law embodied in the constitution, and doubts will be resolved in favor of the constitutionality of the plan." *Johnson,* 366 S.W.3d at 20 (internal quotation omitted). When there is contested evidence,[9] this Court will affirm the circuit court's factual findings unless there is no substantial evidence to support the finding or the finding is against the weight of the evidence. *Pearson II,* 367 S.W.3d at 43.

In *Johnson*, this Court determined a "plaintiff also must prove that any minimal and practical deviation from population equality or compactness in a district does not result from application of recognized factors that may have been important considerations

---

[9] Appellants claim to have uncontroverted evidence proving there was no ***requirement*** to split a political subdivision. Because Appellants misunderstand the burden of proof, this evidence does not satisfy Appellants' burden of production and persuasion. "[A] party can contest the evidence in many ways, such as by putting forth contrary evidence, cross-examining a witness, challenging the credibility of a witness, pointing out inconsistencies in evidence, or arguing the meaning of the evidence." *Pearson II,* 367 S.W.3d at 44.

in the challenged map." 366 S.W.3d at 30. The Court found the language of "[t]he population equality and compactness requirements … have interrelated standards that are impacted by the existence of other possibilities." *Id*. At that time, the redistricting standard stated:

> The commission shall reapportion … by dividing the population of the state by the number one hundred sixty-three and shall establish each district so that the population of that district shall, **as nearly as possible** equal that figure. Each district shall be composed of contiguous territory as compact **as may be**.

Mo. Const. art. III, sec. 2 (1982) (emphasis added). Because the requirements for population equality and compactness were curbed with the language "as nearly as possible" and "as may be," the standards "are impacted by the existence of other possibilities." *Johnson*, 366 S.W.3d at 30.

Although *Johnson* interpreted different constitutional language, this Court relied on fundamental principles equally applicable here. Prior to *Johnson*, this Court had long recognized that political subdivision lines and compliance with federal law are permissible and important considerations in the redistricting process, even if those factors were not explicitly enumerated in the constitution. *See Pearson I,* 359 S.W.3d at 40 n.1 (recognizing counties as important governmental units); *Preisler v. Kirkpatrick*, 528 S.W.2d 422, 425-26 (Mo. banc 1975) (discussing political subdivisions, historical boundary lines, and population density as important considerations in the redistricting process), *overruled on other grounds by Pearson I*, 359 S.W.3d at 39; *Preisler v. Hearnes*, 362 S.W.2d 552, 556 (Mo. banc 1962) (noting "counties are important governmental units"); *Preisler v. Doherty*, 284 S.W.2d 427, 432 (Mo. banc 1955)

20

(identifying county, town, ward, or other district lines as boundaries map-drawers may follow). In discussing these cases, this Court recognized:

> These cases do not hold that constitutional requirements can be disregarded to consider other factors but, instead, recognize that the constitutional requirements themselves incorporate such considerations by use of the standards "as may be," and "as possible." As part of the standards for the constitutional requirements, federal law and the previously recognized factors are *in fact* of constitutional significance, and this Court recognizes that in its precedent.

*Johnson*, 366 S.W.3d at 30. In context, this Court's use of the phrase "previously recognized factors" refers to this line of precedent identifying political subdivision lines as permissible factors in the redistricting process.

The current language of the constitution enshrines these "recognized factors" explicitly. *See* Mo. Const. art. III, sec. 3(b). As explained above, subdivision (2) requires compliance with the United States Constitution and applicable federal law and subdivision (4) provides for community preservation by requiring districts to follow political subdivision lines to the extent possible, listing certain criteria map-drawers must follow.

Accordingly, contrary to Appellants' suggestion, the 2020 amendment did not alter the standard articulated in *Johnson*. A plaintiff still has the burden of proving a redistricting plan is clearly and undoubtedly unconstitutional, and that burden must account for the factors the redistricting commission "must consider and those it is permitted to consider." *Johnson*, 366 S.W.3d at 30. The plaintiff must objectively prove that a constitutional requirement – population equality, compliance with federal law, contiguity, compactness (as much as may be), community preservation (to the extent

21

possible), or partisan fairness and competitiveness (subject to the foregoing factors) – has not been met. To the extent a plaintiff alleges a district violates a constitutional requirement containing discretionary language, such as compactness or community preservation, that plaintiff will have the burden to show this violation is not a minimal and practical deviation necessary to comply with other constitutional requirements.[10]

The circuit court correctly applied this standard to the challenged districts here. The circuit court then found Appellants did not meet their burden of proving the split political subdivisions were not the result of the Judicial Commission's consideration of recognized factors because the "evidence shows that any deviation results from valuing compactness over political subdivisions, as the Constitution permits." *See* Mo. Const art. III, sec 3. When other constitutional requirements are satisfied, the constitution provides that "split counties … shall each be as few as possible" "[t]o the extent consistent with subdivisions (1) to (3)[.]" Mo. Const. art. III, sec. 3(b)(4); *see also supra* Point III. The circuit court found the Secretary's expert well qualified and the Appellants' expert unhelpful. The Secretary's expert testified that Convex Hull scores, a measure of compactness, were used to draw the Senate Map. The Secretary's expert also testified Buchanan County was split in about 23 percent of simulated maps and Hazelwood was split in about 11 percent of simulated maps. The Secretary's expert testified that

---

[10] As this Court previously noted in *Johnson*, a plaintiff may satisfy this objective standard by presenting evidence – such as proposed maps – demonstrating the alleged violation was not necessary to achieve the same compliance with other constitutional requirements. *See supra* Point I. "So long as the evidence persuades the trial court that the challenged map clearly and undoubtedly contravenes the constitution, the plaintiff will prevail." *Johnson*, 366 S.W.3d at 31 (internal quotation omitted).

boundaries in populated areas were harder to draw and "are the ones you would tend to split."

Based on all the evidence presented at trial, the circuit court found random simulations often split Buchanan County and Hazelwood, indicating these splits were often necessary to achieve population equality. The circuit court further found there was no indication of partisan or racial gerrymandering resulting from splitting these two political subdivisions. The circuit court found these two districts achieved greater compactness than Appellants' proposed map and, further, Appellants failed to address, much less rebut, this evidence. Finally, the circuit court observed: "Splitting one county and one municipality represent *the least amount of discretion—or, at worst, an appropriate amount here*—that can be afforded any redistricting commission." (Emphasis added).

Accordingly, the circuit court applied the proper legal standard to the facts and evidence adduced at trial. There was substantial evidence supporting the circuit court's finding that the deviations in the Senate Map were the result of considering population equality and compactness. Points V and VI are denied.

*Points VII and VIII: The Judicial Commission was not a necessary party, nor was it error to quash discovery requests served to the Judicial Commission*

In Points VII and VIII, Appellants argue the circuit court erred in sustaining the Judicial Commission's motion to dismiss the Judicial Commission as a party and abused its discretion by quashing Appellants' discovery requests to the Judicial Commission.

First, Appellants argue the circuit court erred in dismissing the Judicial Commission from this lawsuit because the Judicial Commission is constitutionally required to be a party under article III, section 7(i). The circuit court sustained the motion to dismiss the Judicial Commission, finding the Judicial Commission was neither a necessary nor indispensable party after the initial filing of the lawsuit because the Judicial Commission could not afford Appellants any form of relief, the Judicial Commission's absence from the lawsuit would not impair any party's ability to protect their interests, and the only issue to be determined in the lawsuit is the objective determination of whether the Senate Map violates the constitution. The circuit court found the Judicial Commission's involvement had no bearing on these issues.[11]

Article III, section 7(i) states, relevant to the parties in a redistricting lawsuit: "Any action expressly or implicitly alleging that a redistricting plan violates this Constitution, federal law, or the United States Constitution shall be filed in the circuit court of Cole County and shall name the body that approved the challenged redistricting plan as a defendant."[12] The Judicial Commission approved the challenged redistricting plan and was named as a defendant in this lawsuit. This satisfies all that the constitution requires.

---

[11] The circuit court also found Appellants failed to state a claim for relief against the Commission, requesting relief only against the Secretary. *See* Rule 55.27(a)(6).

[12] The Senate Independent Bipartisan Citizens Commission is the first body that may approve a senate redistricting plan. Mo. Const. art. III, sec. 7(a).

The question remains whether the Judicial Commission continues to be a required party after the lawsuit is filed. The circuit court correctly found it is not. Rule 52.04 governs required parties to a lawsuit. A party is required if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may; (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Rule 52.04(a). Complete relief can be granted by the Secretary, the remaining defendant,[13] *see* Rule 52.04(a)(1), and the Judicial Commission does not have an interest in the disposition of this lawsuit, *see* Rule 52.04(a)(2). Therefore, after the lawsuit was filed, the Judicial Commission was no longer a required party and was properly dismissed as a party pursuant to Rule 52.06.[14]

Finding the Judicial Commission is not a necessary or indispensable party for this suit, the circuit court did not err in dismissing the Judicial Commission from the suit. Point VII is denied.

Second, Appellants argue the circuit court abused its discretion in sustaining the Judicial Commission's motion to quash discovery requests propounded by Appellants.

---

[13] Appellants' petition requests injunctive relief against the Secretary, requesting the Secretary not use the Senate Map "for any purpose." Appellants also requested a declaratory judgment, asking the circuit court to declare the Senate Map unconstitutional and adopt their proposed map. This relief comes from the court, and this claim of relief does not transform the Judicial Commission into a necessary party under Rule 52.04(a).
[14] Rule 52.06 permits parties to be dropped from the lawsuit "at any stage of the action and on such terms as are just."

Relying on *Johnson*, the circuit court found Appellants' discovery requests were not reasonably calculated to lead to the discovery of admissible evidence because the requests were "not relevant to the ultimate standard governing redistricting challenges" in that "[t]he issue of whether the constitutional requirements are satisfied is determined objectively." The circuit court did not err in finding Appellants' discovery requests were not reasonably calculated to lead to the discovery of admissible evidence.

As the circuit court correctly noted, and Appellants have argued before this Court,[15] this Court has previously held "the issue of whether the constitutional requirements are satisfied is determined ***objectively***, requiring no proof of the subjective intent of the reapportionment commission." *Johnson*, 366 S.W.3d at 30 (emphasis added); *see also id.* at 24 (finding the methods for redistricting listed in the Constitution are "mandatory and objective, although the language used in the requirements themselves creates a level of flexibility in their compliance"). The Judicial Commission's deliberations, thought processes, or other potential redistricting maps considered are not relevant in determining whether the Senate Map violates the constitution. The Senate Map is all that is necessary to determine whether the objective constitutional requirements have been met. Although Appellants argue the circuit court made findings about the Judicial Commission's decisions,[16] such findings are supported by objective

---

[15] *See supra* Point I.

[16] Appellants take issue with the following statements: "[T]he Judicial Commission chose districts that were more compact"; "[T]he evidence clearly shows that to the extent there is any perceived imperfection in the Senate Map, the choices made by the Judicial Redistricting Commission are reasonable"; and "[T]he evidence also shows that splitting those two political subdivisions are natural choices that do not show any indication of

26

observation of the Senate Map rather than requiring investigation into the Judicial Commission's processes.

Finding the circuit court did not err in quashing discovery of the Judicial Commission in that Appellants' discovery requests would not yield relevant evidence, Point VIII is denied.

**Conclusion**

The circuit court's judgment is affirmed.

_____
KELLY C. BRONIEC, JUDGE

Russell, C.J., Fischer, Ransom and
Gooch, JJ., concur; Powell, J., dissents
in separate opinion filed; Wilson, J.,
concurs in opinion of Powell, J.

---

improper manipulation of the districts." Each of these statements refers to information found by objectively observing the Senate Map. The "choices" of the Judicial Commission are apparent on the face of the Senate Map, and the alternative choices that the Judicial Commission may or may not have rejected in choosing the Senate Map are not dispositive in determining whether the Senate Map is constitutional.



# SUPREME COURT OF MISSOURI
## en banc

CLARA FAATZ, et al.,                      )
                                          )
                                          )
    Appellants,                   )
                                          )
v.                                        )    No. SC100277
                                          )
JOHN ASHCROFT, MISSOURI                   )
SECRETARY OF STATE,                       )
                                          )
                                          )
    Respondent.                   )

### DISSENTING OPINION

I respectfully dissent from the principal opinion's holding that Appellants failed to preserve their constitutional challenge to the Missouri Senate redistricting plan ("Senate Map"). In the circuit court, Appellants alleged the Senate Map violates both the community preservation and equal population requirements set forth in the Missouri Constitution, and Appellants raised both of these inextricably intertwined claims at trial. Appellants, therefore, preserved their constitutional challenge to the Senate Map. Reaching the merits, I would hold the Senate Map violates article III, section 3 of the Missouri Constitution because it both allows for a population deviation of greater than one percent for senate districts containing Buchanan County and the city of Hazelwood *and*

fails to preserve these two communities as required by the constitution.[1]

## Analysis

As the principal opinion sets forth, the Missouri Constitution provides the criteria and methods that must be observed in a Senate redistricting map. Article III, section 3 requires new maps to be drawn based on five identified criteria and directs use of its methods "in order of priority[.]"

First, districts "shall be as nearly equal as practicable in population." *Id.* § 3(b)(1). This simply is devised by determining the population of the constitutionally required 34 senate districts if the population were the same in each district. The resulting population in each district is considered the "ideal population." *Id.* "Districts are as nearly equal as practicable in population if no district deviates by more than one percent from the ideal population of the district." *Id.* Section 3(b)(1), however, allows a district to "deviate by up to three percent [of the ideal population] if necessary to follow political subdivision lines" and preserve communities consistent with section 3(b)(4). *Id.*

Second, the districts must comply with federal constitutional and statutory requirements, such as the federal voting rights act. *Id.* § 3(b)(2). Third, the districts must be as contiguous and compact "as may be[,]" "[s]ubject to the requirements of subdivisions (1) [equal population] and (2) [federal constitutional and statutory criteria] of this

---

[1] The Judicial Commission, which drew and submitted the Senate Map to the Secretary of State, operated on a very short timetable to complete its constitutional task of creating a redistricting map. Despite my constitutional misgivings, the Judicial Commission is commended for its Herculean efforts to complete the Senate Map in the very limited time it was provided to draw and approve the Senate Map after the Citizens Commission failed to agree on a map.

subsection." *Id*. at § 3(b)(3).  Fourth, "communities shall be preserved[,] "[t]o the extent consistent with subdivisions (1) to (3)." *Id.* § 3(b)(4).  Accordingly, the constitution requires communities to be preserved within the districts, but the constitution contemplates that political subdivisions may need to be divided and can be preserved only if "consistent with subdivisions (1) to (3) [equal population, federal constitutional and statutory criteria, and compactness]." *Id.*  Finally, "[d]istricts shall be drawn in a manner that achieves both partisan fairness and, secondarily, competitiveness." *Id.* § 3(b)(5).  "[B]ut the standards established by subdivisions (1) to (4) [equal population, federal constitutional and statutory criteria, compactness, and community preservation] shall take precedence." *Id.*

Pursuant to the Missouri Constitution, then, the first and most important priority in redistricting is equal population; second, federal and constitutional and statutory criteria; third, compactness; fourth, community preservation; and fifth, partisan fairness and competitiveness.  This constitutional scheme provides some discretion and choices for redistricting maps in the areas of compactness, community preservation, and partisan fairness/competitiveness, but this discretion is tempered by the bright line, higher priority requirements of equal population and federal constitutional and statutory criteria.

*Constitutional Violation*

What is fundamentally clear from Appellants' challenge to the Senate Map is their vote has been diluted.  Their communities, Buchanan County and Hazelwood, have not been preserved, and, as a result, they are unable to vote in unison with their neighbors to voice the concerns and desires of their individual communities.  Even more troubling, the districts containing their divided communities have larger populations than many other

3

senate districts and dilute the vote of the individual members of their communities. The Senate Map splits Buchanan County between districts 12 and 34 and splits Hazelwood between districts 13 and 14. Districts 34, 13, and 14 have far more voters than the average district in the state and, thus, do not enjoy the obvious advantages of preserving their community's voting bloc. This circumstance is exactly what the Missouri Constitution seeks to prevent.

As noted above, the Missouri Constitution provides, as the first and most important criteria in redistricting, that "[d]istricts shall be as nearly equal as practicable in population, and shall be drawn on the basis of one person, one vote." Mo. Const. art. III, § 3(b)(1). This paramount consideration is to ensure redistricting in accordance with fundamental principles of representative government guaranteed by the federal constitution. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Id.* at 555. This right can be abridged through voter dilution. *Id.*

Voter dilution occurs when senators or representatives are selected from districts of unequal population, effectively making votes in larger districts worth less than votes in smaller districts. The United States Supreme Court has held such apportionment schemes to be at odds with our bedrock conceptions of political equality and in violation of the equal protection of the laws guaranteed by the federal constitution. "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the

4

Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963). Accordingly, "the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis." *Reynolds*, 377 U.S. at 576. This is such an important right, the United States Supreme Court allows only relatively minor population deviations among state legislative districts, based on legitimate reasons such as preserving communities, to be constitutionally permitted. *Id.* at 578; *White v. Regester*, 412 U.S. 755, 764 (1973).

In accordance with the federal constitution, the equal population provision in the Missouri Constitution requires districts to contain equal population with allowance for only one percent deviation in general and up to three percent deviation if necessary to follow political subdivision lines "consistent" with section 3(b)(4). Mo. Const. art. III, § 3(b)(1). Likewise, the community preservation provision of the Missouri Constitution requires communities be preserved, but only if such preservation is "consistent" with the requirements of equal population set out in section 3(b)(1). *Id.* § 3(b)(4). Ensuring equal population in both preserved and divided communities is enshrined and guaranteed in both the federal and Missouri constitutions.

Reviewing the undisputed evidence presented in this case, splitting Buchanan County and Hazelwood violates the equal population provision in article III, section 3(b)(1) and the community preservation provision in section 3(b)(4) of the Missouri Constitution. The Senate Map divides Buchanan County into districts 12 and 34 and Hazelwood into districts 13 and 14. The evidence presented to the circuit court, however, established that Buchanan County and Hazelwood could have been undivided and preserved in one district

5

and still comply with the equal population requirement. Instead, three of the resulting districts containing parts of the divided communities, districts 13, 14, and 34, deviate from the ideal population by more than the one-percent threshold but are less than three-percent deviation. The community preservation provision, article III, section 3(b)(4), is clear that preserving communities in a redistricting map must be "consistent with subdivision[] (1) [equal population]." The equal population provision, article III, section 3(b)(1), is also clear that no district may deviate by more than one percent from the ideal population of the district, "except that a district may deviate by up to three percent if necessary to follow political subdivision lines consistent with subdivision (4) of this subsection[.]" This provision does not allow deviating up to three percent solely to split a political subdivision, only for keeping it together. *Id.* In this case, dividing Buchanan County into districts 12 and 34 and Hazelwood into districts 13 and 14, each results in districts (13, 14, and 34) that deviate from the ideal population by more than one percent *and* fail to follow political subdivision lines. This violates the constitutional parameters, which are mandatory and must be given effect. *Pearson v. Koster*, 359 S.W.3d 35, 40 (Mo. banc 2012).

The circuit court's justification for excusing this violation conflates the importance of the priority scheme set out in the Missouri Constitution. The circuit court reasoned the community preservation provision is not violated because the population deviation can exceed one percent to ensure the redistricting map is more compact. This argument rests on reading the language of the community preservation exception in section 3(b)(1) (providing a district may deviate by up to three percent if necessary to follow political subdivision lines "consistent with subdivision (4) [community preservation] of this

6

subsection") as incorporating article III, section 3(b)(4)'s provision that communities shall be preserved "[t]o the extent consistent with subdivisions (1) to (3)[.]" But this interpretation fails to take into account the unambiguous guiding principle of section 3(b), which expressly provides its criteria are listed in order of priority. Subdivision (1) provides equal population is the first and most important priority, only specifying and allowing for deviation for community preservation as provided by subdivision (4). The circuit court's reading of section 3 nullifies this clear constitutional prioritization of equal population by essentially making it subservient to the compactness criteria listed as a lower priority, the exact reverse of the constitutional mandate. This Court cannot resort to such a construction. *State ex rel. Hillman v. Beger*, 566 S.W.3d 600, 605 (Mo. banc 2019) ("If the language … is plain and unambiguous, this Court is bound to apply that language as written and may not resort to canons of construction to arrive at a different result."). This is especially true here given the clear, obvious, and paramount importance of each district containing equal population unless necessary to preserve communities to guarantee the undiluted right to vote to each Missouri citizen. *See Gray*, 372 U.S. at 381; *Reynolds*, 377 U.S. at 568.

Contrary to the circuit court's holding, then, article III, section 3(b)(1) [equal population] does not incorporate subdivisions (2) [federal constitutional and statutory criteria] and (3) [compactness] into its three-percent community preservation exception. Rather, the reference to subdivision (4) in subdivision (1) allows a deviation of more than one percent to accommodate the preservation of communities consistent with subdivision (4). Subdivision (4) contains various parameters regarding community preservation, and

7

within these guidelines is the sole exception to deviating by more than one percent from the ideal population of a district.

The equal population and community preservation provisions mean what they say: no district may deviate from greater than one percent "except … if necessary to follow political subdivision lines consistent with subdivision (4)[.]" Because splitting Buchanan County and Hazelwood into separate districts was unnecessary to comply with the equal population requirement, dividing these communities violates article III, section 3(b) by allowing senate districts containing portions of each of these political subdivisions to deviate by more than one percent of the ideal population. The Senate Map as it pertains to districts 34, 12, 13, and 14 is unconstitutional.

*Preservation*

The principal opinion evades Appellants' undeniable constitutional challenge, however, by instead going to great lengths to find Appellants' claim to be unpreserved and, therefore, unreviewable. The principal opinion finds Appellants solely assert a community preservation violation and did not allege an equal population violation. Specifically, the principal opinion contends Appellants allege facts showing a violation of community preservation, but Appellants do not allege facts warranting an equal population violation. The principal opinion, therefore, finds Appellants failed to preserve their constitutional challenge to the Senate Map. This conclusion is misplaced and unwarranted for several reasons.

First, Appellants specifically pleaded and alleged an equal population violation in their amended petition. Appellants allege in paragraph 22 of their amended petition that

8

"the Constitution provides criteria that must be followed when drawing state senate and house of representative maps." The very next paragraph, paragraph 23, specifically cites to and quotes extensively from section 3(b)(1), the equal population criteria, wherein Appellants allege that districts must be "nearly equal as practicable in population" with deviations of not "more than one percent" or not more than "three percent if necessary to follow political subdivision lines[.]" In the next paragraph, paragraph 24, Appellants cite to and quote extensively from section 3(b)(4), the community preservation criteria, in alleging that districts shall preserve communities by following political subdivision lines. In paragraphs 27 and 29, Appellants allege Buchanan County and Hazelwood are split between two districts. In paragraph 26, Appellants allege "[c]ommunities are *not* preserved if counties are split when not necessary to comply with other, higher order requirements in the Constitution." The only higher order requirement cited in Appellants' amended petition is section 3(b)(1), the equal population requirement. In fact, Appellants cite to only two provisions from article III, section 3 of the Missouri Constitution: sections 3(b)(1) and 3(b)(4). No other provision from the redistricting priority scheme is referenced or mentioned in their amended petition. Present in Appellants' petition, therefore, is the allegation that the Senate Map fails to preserve communities in compliance with the higher priority requirement of equal population set forth in section 3(b)(1). It cannot be said that Appellants have not pleaded facts showing a 3(b)(1) violation because they allege that both Buchanan County and Hazelwood were split in a way that does not preserve communities in compliance with section 3(b)(1)'s equal population requirement.

9

The amended petition then goes on to allege that the Senate Map "does not comply with all the requirements [plural] of the Missouri Constitution." The petition alleges the Senate Map "divides" Buchanan County and Hazelwood, and, "to comply with the constitutional requirement that district populations deviate by no more than three percent if necessary to follow political subdivision lines, the [Appellants' proposed senate map] makes minor changes to two other senate districts." Finally, Appellants allege they "seek declaratory judgments [plural] that the [Senate Map] violates these constitutional requirements [plural] and is invalid." Any fair reading of the amended petition must acknowledge that, when it refers to violations of plural constitutional requirements in paragraph 36, it is referring to the equal population and community preservation requirements in article III, sections 3(b)(1) and 3(b)(4), cited to and quoted from in the amended petition, paragraphs 23 and 24. Appellants' entire lawsuit is premised on the Senate Map's failure to comply with sections 3(b)(1) and 3(b)(4) by splitting communities and yet creating districts that do not contain the proper deviation from the ideal population.

These allegations are repeated in Count I, concerning the improper division of Buchanan County, and in Count II, concerning the improper division of Hazelwood. In Count I, after alleging the Senate Map divides Buchanan County, and after noting the equal population requirement allows for population deviations for up to three percent to preserve political subdivision lines, Appellants allege the "Senate Map does not comply with all the requirements [plural] of the Missouri Constitution." Similarly, after alleging the improper division of Hazelwood, Appellants allege in Count II that their proposed senate map "shows that it is possible to draw a map that complies with all constitutional requirements

10

[plural], including preserving communities." Again, this reference to plural constitutional requirements can mean only the equal population and community preservation requirements in article III, sections 3(b)(1) and 3(b)(4), which Appellants cite to and quote from in paragraphs 23 and 24 of the amended petition without referring to any other provision in the constitutional priority redistricting scheme. Appellants' petition, therefore, clearly alleges the failure to follow political subdivision lines in Buchanan County and Hazelwood violates section 3(b)(4) by failing to preserve communities and 3(b)(1) because the equal population requirement allows a deviation up to three percent only to preserve, not divide, communities.

To justify finding Appellants' claim to be unpreserved, the principal opinion places too much weight on the lack of specific factual allegations showing an equal population violation in the amended petition. But this Court has never read a pleading so narrowly to find a constitutional question unpreserved when a party alleges a specific constitutional section has been violated yet fails to plead sufficient facts showing a violation occurred. In fact, this Court has only found constitutional questions not preserved for review when a party categorically fails to cite a constitutional section or fails to plead *any* facts showing the alleged constitutional violation. *See, e.g.*, *Callier v. Dir. of Revenue*, 780 S.W.2d 639, 642 (Mo. banc 1989) (finding a constitutional question was not preserved when the petition "contain[ed] no designation of any constitutional section claimed to have been violated" and "plead[ed] no facts showing a constitutional violation"); *Record Newspaper Co. v. Indus. Comm'n*, 340 S.W.2d 613, 615 (Mo. 1960) (finding a constitutional question was not preserved when the question was completely absent from the record, including in the

11

plaintiff's petition); *Barnes v. Anchor Temple Ass'n*, 369 S.W.2d 192, 194 (Mo. 1963) (finding a constitutional argument was not preserved when the defendant failed to cite to any constitutional provision in the motion for new trial); *State ex rel. Allison v. Barton*, 197 S.W.2d 667, 669 (Mo. banc 1946) (finding a constitutional question was not preserved when the relator failed to cite any provisions of the then in effect 1875 Constitution); *Mayes v. Saint Luke's Hosp. of Kan. City*, 430 S.W.3d 260, 266-67 (Mo. banc 2014) (finding a constitutional challenge not preserved when plaintiffs pleaded specific constitutional provisions but pleaded "**no** statement of facts in the section raising the constitutional objections" (emphasis added)); *Atkins v. Dep't of Bldg. Regul., City of Springfield*, 596 S.W.2d 426, 434 (Mo. 1980) ("A party who asserts the unconstitutionality of a statute or ordinance bears the burden of supporting that contention by at least relating his argument to the statute or ordinance and issue at hand."). As shown above, that is simply not the case here. Appellants specifically cite to section 3(b)(1) in their amended petition and allege facts that the Senate Map failed to preserve the communities of Buchanan County and Hazelwood in compliance with the higher priority requirement of equal population as set forth in section 3(b)(1). The principal opinion's decision, therefore, to invoke preservation requirements and avoid review of this important constitutional principle is unnecessary and unwarranted.

The principal opinion's conclusion that Appellants failed to preserve their constitutional claim also ignores that Appellants' constitutional challenge based on sections 3(b)(1) and 3(b)(4) are inextricably intertwined. To determine if the community preservation provision was violated as provided by article III, section 3(b)(4), the court

12

must consider equal population. In fact, the constitution requires this review. Article III, section 3(b)(4) specifically dictates that "communities shall be preserved" "consistent with subdivision[] (1) [equal population]." *C.f. Johnson v. State*, 366 S.W.3d 11, 24 (Mo. banc 2012) ("It is impossible to consider whether the map is as compact 'as may be' without also considering whether the population is 'as nearly as possible, equal.' One determination cannot be made without consideration of the other."). While the principal opinion is correct that a community preservation violation could exist in isolation, any analysis of a redistricting map's compliance with section 3(b)(4) necessarily includes consideration of its compliance with section 3(b)(1). Put simply, section 3(b)(4) is cross-referenced in section 3(b)(1), and section 3(b)(1) is cross-referenced within section 3(b)(4). It is painfully obvious that, when you cite to one provision, you are citing to the other by cross-reference.[2]

Moreover, preserving equal population is the paramount, non-negotiable assumption implicated by any community preservation challenge to a redistricting plan. When a district has a population deviation of more than one percent but less than three

---

[2] The principal opinion suggests that finding sections 3(b)(1) and 3(b)(4) as inherently intertwined would "open the door to allow provisions of subsection 3(b) that are only tangentially mentioned in the pleadings or at trial to be preserved for appeal without an adequate record." This concern is misfounded because, as the principal opinion acknowledges, subdivisions (1) and (4) are the only subdivisions which cross-reference each other. By contrast, subdivisions (3) and (5) reference only the subdivisions respectively prioritized ahead of them to make clear the criteria of each respective subdivision are subordinate to those methods listed before it. Moreover, Appellants' amended petition "designated specifically" article III, sections 3(b)(1) and 3(b)(4) to have been violated, "by explicit reference to the article and section[s]" and "by quotation of the provision[s][.]" *See Mayes*, 430 S.W.3d at 266. This case does not implicate the concerns raised by the principal opinion.

percent, it violates the equal population requirement in article III, section 3(b)(1) unless the deviation was caused by following political subdivision lines in the manner set out in (and following in order the four criteria described in) article III, section 3(b)(4). In other words, if one or more of the districts resulting from dividing Buchanan County or Hazelwood have a population deviation of more than one percent, that split violates both sections 3(b)(4) and 3(b)(1) because population deviations exceeding one percent can be justified (up to three percent) only by political subdivision lines that comply with section 3(b)(4) and preserve communities.

For the reasons discussed, Appellants' constitutional challenge plainly and clearly allege violations of both the constitutional equal population requirement set forth in section 3(b)(1) and the community preservation requirement set out in section 3(b)(4). Therefore, Appellants have properly preserved their assertions that the divisions of Buchanan County and Hazelwood violate the constitution as the requirements of equal population and community preservation are inextricably intertwined and cannot be reviewed without implicating the other when the split communities result in a deviation of more than one percent from the ideal population for a district containing a portion of the divided community.

Not only is it clear that Appellants alleged violations of article III, sections 3(b)(1) and 3(b)(4) in their amended petition, but the parties also litigated both equal population and community preservation criteria at trial and clearly understood compliance with both constitutional requirements were at issue in the case. During the trial, Appellants argued splitting Buchanan County and Hazelwood violated the equal

population provision. Specifically, during opening statements, Appellants directed the circuit court to:

> [L]ook at these constitutional provisions which Your Honor heard about in some of the other arguments. . . . First one is sometimes referred to as equal population. District shall be as equal as possible. And I've highlighted here, measured by dividing the number of districts into the statewide population. So we've got down below 34 districts, total population divided by 34, you get an ideal population number. And it says in there that it is equal in population because you can't dial it down to the exact number if it deviates by more than 1 percent, if no district deviates by more than 1 percent, but the districts may be 3 percent if necessary to follow political subdivision lines in Section (4). So the very first thing we do is divide into 34 districts of equal population and it tells us to go look at Section (4) and see whether it impacts the deviation. . . . These three – Well, three of these four districts, 34, that is the Buchanan County, 13 and 14, all exceed 1 percent. This is an excerpt from an exhibit that actually the State's expert prepared. So all three of these deviate by more than 1 percent, 2.7, 2.67 and 2.67. **So that kicks us into the discussion we're really here about which is these political subdivisions.**

(Emphasis added).

Considerable testimony was also adduced during the trial regarding equal population and complying with the requirements of section 3(b)(1). Equal population was raised and discussed in depth during both Appellants' case-in-chief and the Secretary's case, but the following testimony from Appellants' witness is especially relevant to explain the claims raised by the Appellants in this case:

> Q. What are we looking at? It says it but just tell the Judge what we're seeing here.
> A. Yes. This is a chart that outlines the deviation of each of the Senate districts in the enacted plan. That is how many more or fewer people it has than the ideal population number. The constitution is very clear that under these circumstances you can – you've got to keep the deviation under 1 percent and if you want to go to 3 percent, per the other conditions, so the final column is what I would have spent most of the time looking at in drawing and evaluating plans, which is, you know, are any of these more than 3 percent in absolute terms, and then of the ones that are more than 1

15

percent, do they follow the community boundaries as outlined in the constitution.

Q. So somebody asked -- I know the Judge is good at math. -- some of these are negative numbers?

A. Yes.

Q. Can you explain positive versus negative numbers?

A. Yeah. So if you are looking at Districts 33 and 34, District 33 has 2,400, 2,500 people less than the 181,000, which is the ideal population, so that works out to minus 1.37 percent. 34 has about -- almost 5,000 more than the ideal number, so the deviation is 2.71. So what matters for our analysis or in my experience the analysis that is done is that absolute value, so it doesn't matter positive or negative. It just means is that first numeral 3 or greater.

Q. Could you tell whether, in looking at the maps in dividing Buchanan County, could you tell whether you have to divide Buchanan County to comply with the population proportion requirements?

A. Can you ask that again so I make sure I understand[?]

Q. Yeah. Could you tell whether you must divide Buchanan County in order to comply with the population requirements?

A. So District 34 has a population deviation of 2.71, so my next step would be, in evaluating this plan, are the relevant jurisdictions kept together, and so I was frankly surprised when Buchanan County was split given these population deviation numbers.

The parties also specifically stipulated to statistical evidence that showed population deviations exceeding one percent in districts 34, 13, and 14 resulting from dividing Buchanan County and Hazelwood. These basic facts were never in question but assumed throughout litigation as the impetus for Appellants' claims, as their opening statement demonstrates. Finally, testimony was also adduced during trial that it was possible to draw maps that did not divide Buchanan County or Hazelwood and still comply with the equal population requirement. In presenting such evidence, Appellants' expert testified "if you wanted to exceed 1 percent, you had to follow the county and municipality lines, that is a pretty clear requirement of subdivision (1)." The Secretary did not object but, instead, agreed, introducing and submitting a proposed remedial senate map that specifically

16

addressed the Appellants' alleged equal population violation. The Secretary's remedial map kept Hazelwood intact within one district and continued to divide Buchanan County but by moving some voting precincts from district 34 to district 12 to ensure compliance with the one percent deviation in the equal population requirement of section 3(b)(1). The Secretary's expert testified he continued to divide Buchanan County because "you can have a split if it is below the 1 percent deviation." He was then asked if he did this "assum[ing] strict compliance with [Appellants'] propos[als]" and he answered, "That is my understanding. You can have a 1 percent deviation … you can go up to 3 percent, assuming you are going up to 3 percent deviation in order to keep a county intact." This was all evidence bearing solely on the issue of equal population required by section 3(b)(1) as applied to the Senate Map and demonstrates the issue of equal population was tried by implied consent. *See Smith v. City of St. Louis*, 395 S.W.3d 20, 25 (Mo. banc 2013) (holding issue is tried by implied consent "when evidence is offered, without objection by any other party, bearing solely on that issue"). In short, compliance with the equal population requirement was clearly litigated and tried to the circuit court, and no one can claim a lack of notice or prejudice from any perceived failure to allege a violation of equal population in Appellants' amended petition.

Appellants properly raised their constitutional challenge in their amended petition, but, even if they had not done so, the testimony and evidence adduced and stipulated to at the trial, the arguments to the circuit court, and the circuit court's judgment itself show both these highly intertwined claims were tried and presented to the circuit court, which ultimately decided this issue in its judgment. *Smith*, 395 S.W.3d at 25. Accordingly, there

17

is no impediment to this Court reviewing Appellants' irrefutable challenge to the Senate Map.

## Conclusion

In dividing Buchanan County and Hazelwood into separate senate districts, the Senate Map both allows for a population deviation of greater than one percent *and* fails to preserve communities. In so doing, the Senate Map violates the redistricting parameters set forth in the Missouri Constitution. Accordingly, I would reverse the circuit court's judgment and remand the case for the court to bring the map into compliance as required by article III, section 7(i).

_____
W. Brent Powell, Judge